United States Court of Appeals,
Eleventh Circuit.

No. 95-6227.

Terry FOY, and Gloria Foy, individually, and as parents and next friend of Theresa[*] Foy, Darron Foy, Tabitha Foy and Lasonya Foy, minors; Booker Grantham, and Fannie Grantham, individually, and as parents and next friend of Jamie Grantham, a minor, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,

v.

Febru HOLSTON, Iola Williams, Charlotte Boatright, Lena Hardaway, Gail Shelfer, Andrew P. Hornsby, Jr., individually and as agents, servants, employees, supervisors and/or directors of the Department of Human Resources, an agency of the State of Alabama, Defendants-Appellants,

Department of Human Resources of the State of Alabama, an agency of the State of Alabama, Defendants.

Sept. 17, 1996.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-94-C-516-W), U.W. Clemon, Judge.

Before EDMONDSON and DUBINA, Circuit Judges, and FARRIS[**], Senior Circuit Judge.

EDMONDSON, Circuit Judge:

The issue in this interlocutory appeal is whether certain Alabama officials are entitled to qualified immunity for their acts involving the Holyland, a religious community. Because Plaintiffs have failed to demonstrate that a defendant violated clearly established federal law, we reverse and instruct the district court to grant each individual defendant summary judgment based on qualified immunity. We remand for further proceedings on claims

---

[*]The docket sheet of the court lists Teresa as "Theresa." In this opinion, we have used the correct spelling of her name.

[**]Honorable Jerome Farris, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

which are not foreclosed by the granting of qualified immunity.

## I. Facts[1]

The Foys and the Granthams are married couples with minor children who belong to Christ Temple Church and live in "The Holyland"—property in Sumter County, Alabama, which the Church owns. When the Foy's daughter, Teresa, was 15 she became friends with Angela Smith, an adult who lived and worked at the Holyland. Teresa's school work and overall comportment deteriorated, and she eventually ran away from home. After three days living outside the Holyland at Angela's aunt's house, Teresa returned to her family.

Upon her return, Teresa was spanked with a belt by her father; her arm was bruised when she dropped her hands to cover her rear. About a week later, Teresa ran away again—this time accompanied by another Holyland youth, Monica Sandifer. After spending the first night away at a house close to the Holyland, the two went to Angela's aunt's house. Angela told her aunt to send the girls to an abandoned store. The Sumter County Department of Human Resources ("DHR") received a tip that two teenagers who had run

---

[1]The "facts" we recite are those found in our review (for our authority to review the record, see note 3, *infra* ) of the pleadings, depositions and affidavits. *See* Fed.R.Civ.P. 56(c). The evidence is construed in the light most favorable to the plaintiff, and we draw all reasonable inferences most favorably to plaintiffs. *Forbus v. Sears Roebuck & Co.,* 30 F.3d 1402, 1403 n. 1 (11th Cir.1994). Most of these "facts" are only the facts for purposes of reviewing a summary judgment decision involving the defense of qualified immunity. A trial (and the jury's ability to make inferences which we may not) might show the actual "facts" to be different from some facts we set out here. See generally *Rodgers v. Horsley,* 39 F.3d 308, 309 (11th Cir.1994) (making a similar observation).

away from the Holyland were at the store.[2]

DHR employees (and defendants below) Iola Williams and Charlotte Boatright went to the store and picked up the two girls. The girls said they had run away from the Holyland; Teresa, who was crying, told Defendants that she had been hit by her father with a belt—she also displayed the bruises on her arm. Monica described being pinched on her breast by a Holyland staffer. The girls alleged other children—naming specifically the Grantham children—were also abused at the Holyland.

Teresa told Defendants that she did not want to see her parents or return to the Holyland; she did not want to have her parents contacted. Monica asked Defendants to call her mother who lived in Mississippi. Williams told Teresa that her parents had to be contacted because of the abuse allegations and to tell them that their daughter was safe. Williams called the Holyland but was told that the Foys were not in. Williams left her name and phone number so that the Foys could call.

Teresa and Monica were taken by Williams to a medical doctor for a physical exam. The doctor reported that Teresa told him that she did not want to go back to the Holyland. In addition, Teresa said she would kill herself if she had to go back. The doctor also

---

[2]DHR has wide-ranging duties and responsibilities under Alabama law where there are reports that a child's welfare is in jeopardy. For example, DHR is charged with making thorough investigations upon oral or written reports of child abuse. Ala.Code § 26-14-7. ("Abuse" is defined as "harm or threatened harm to a child's health or welfare." Ala.Code § 26-14-1.) And, DHR is authorized to take a child into protective custody initially without the consent of the child's parents if the circumstances are such that continuing custody with the parents presents an imminent danger to the child's life or health. Ala.Code § 26-14-6.

said he observed the bruises on Teresa's arm and said that he observed marks on Monica's breast.

Teresa was placed in foster care. About 10 days after Teresa was picked up, a "72-hour hearing" was held before Judge Hardaway. (Judge Hardaway had signed a "pick-up" order for Teresa the day before.) Defendant Williams, herself, was notified of the 30 April hearing on 29 April. She called the Holyland to notify Teresa's parents. Teresa's mother attended the hearing with an appointed lawyer. At the hearing, Teresa testified and also talked with Judge Hardaway privately; she informed Judge Hardaway that she did not wish to return to the Holyland and said she did not want to have contact with her parents. Teresa's mother was not allowed to talk to Teresa before or during the hearing. Just over a week later, the Juvenile Court held another hearing; and the court gave temporary custody of Teresa to DHR.

Monica was picked up by her mother; but Teresa remained in foster care. While in foster care, Teresa was permitted telephone contact with her mother. Defendants Boatright and Williams called Teresa on the phone and also drove Teresa to counseling sessions. In her later deposition, Teresa testified that Defendants Boatright and Williams (as well as another DHR worker, Ms. Widemon) were supportive and told her that things were going to be all right. Initially, the Foys had little contact with their daughter; but Teresa eventually decided that she wanted to see her mother, and DHR employees set up meetings between the two. In August 1993, Teresa returned to her parents.

Meanwhile, DHR, filed a June 1993 petition (called the

"Grantham case") in Juvenile Court seeking to investigate allegations that 17 children living in the Holyland had been abused. In October, a court ordered the children to be produced; and DHR conducted videotaped interviews with the children. By November 1993, the interviews were completed and soon thereafter DHR moved to dismiss the Grantham case.

In December 1993, Defendant Hornsby, Commissioner of the Department of Human Resources, conducted a multi-agency meeting about the Holyland. State and County officials discussed the Holyland's sewage system, a fire on the Holyland's grounds, the application of child labor laws to the Holyland, and reports of child abuse. The different agencies discussed their contacts with and responsibilities for the Holyland. The agencies also prepared memoranda about the concerns raised at the meeting. The record does not show that this meeting spurred acts by state officials directed against the Holyland or its residents.

Plaintiffs sued various state officials connected with DHR under section 1983. Plaintiffs alleged that the state official defendants were prejudiced against the Holyland and its residents and had denied them the rights "of Freedom of Religion and the free exercise of their religion and their right to freedom of association and freedom of speech as guaranteed under the Constitution of the United States." Plaintiffs also alleged equal protection violations. Defendants moved for summary judgment based on qualified immunity, but the district court denied this motion.

Defendants took this interlocutory appeal.[3]

## II. Discussion

Claims for money damages against government officials in their individual capacity involve substantial costs not only for the individual official—who incidentally may be innocent—but for society in general. "These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge

---

[3]We have jurisdiction despite the absence of a final order. This appeal—unlike *Johnson v. Jones,* --- U.S. ----, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)—is not based solely on questions of evidentiary sufficiency. Instead, the appellants raise the core qualified immunity issue (which is a legal issue) of whether, taking the facts in the light most favorable to the plaintiffs, clearly established federal rights were violated. It is the raising of this legal issue which permits us to review on interlocutory appeal the order denying qualified immunity. *See Behrens v. Pelletier,* --- U.S. ----, ----, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996) ("[S]ummary-judgment determinations are appealable when they resolve a dispute concerning an abstract issue of law relating to qualified immunity—typically, the issue whether the federal right allegedly infringed was clearly established.") (citations, internal quotation marks and brackets omitted).

The district court denied Defendants' motion by stamping the word "DENIED" on the motion and signing the judge's name under the stamp. So, the district court made no express findings of fact and did not discuss whether it was clearly established that Defendants acted unlawfully. The Supreme Court has explained that where core qualified immunity issues are raised on appeal and where the district court fails to make findings of fact, the appellate court must undertake a review of the record to determine the facts in the light most favorable to the nonmoving party. *Behrens,* --- U.S. at ----, 116 S.Ct. at 842. On the right of appellate courts to review the record in interlocutory appeals of the denial of qualified immunity generally, see *Cottrell v. Caldwell,* 85 F.3d 1480 (11th Cir.1996).

of their duties.' " *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (citations omitted).

The qualified immunity defense is the public servant's (and society's) strong shield against these dangerous costs. Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow,* 457 U.S. at 817-19, 102 S.Ct. at 2738. According to the Supreme Court, the *Harlow* standard "purged qualified immunity doctrine of its subjective components," *Mitchell v. Forsyth,* 472 U.S. 511, 517, 105 S.Ct. 2806, 2810, 86 L.Ed.2d 411 (1985), and "rejected the inquiry into state of mind in favor of a wholly objective standard," *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). As the Supreme Court has written just this year, "Harlow adopted this criterion of "objective legal reasonableness,' rather than good faith, precisely in order to "permit the defeat of insubstantial claims without resort to trial.' " *Behrens v. Pelletier,* --- U.S. ----, ----, 116 S.Ct. 834, 838, 133 L.Ed.2d 773 (1996) (citations omitted). "Objective legal reasonableness is the touchstone." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc).

Once the qualified immunity defense is raised, plaintiffs bear the burden of showing that the federal rights allegedly violated were clearly established. *See Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.1989) (citing *Mitchell,* 472 U.S. at 526-28,

105 S.Ct. at 2816). This burden is not easily discharged: "That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*." *Lassiter,* 28 F.3d at 1149. Plaintiffs cannot carry their burden of proving the law to be clearly established by stating constitutional rights in general terms. *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989). We conclude from our review of Plaintiffs' pleadings, briefs, and the record that they have asserted two kinds of constitutional claims which require discussion: family privacy and discrimination on the basis of religion.[4]

## A. Discrimination

As we understand it, Plaintiffs say that placing (and keeping) Teresa in foster care, interviewing the children in the Grantham case, and holding the multi-departmental meeting of state officials violated their constitutional rights because Defendants acted as they did out of a hostility toward the religious teachings of the Christ Temple Church. Because Plaintiffs argue that their First Amendment and equal protection rights have been violated by disparate treatment on the basis of religion, discriminatory

---

[4]We also observe that Plaintiffs did not allege (or argue to us) that Defendants' failure to follow state procedures resulted in a violation of procedural due process. We point out that Defendants cannot be said to have violated clearly established federal law simply by failing (if there was a failure) to follow provisions of the Alabama code or state regulations which govern child custody matters. *See Davis v. Scherer,* 468 U.S. 183, 193–95, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (officials "do not lose their qualified immunity merely because their conduct violates some [state] statutory or administrative provision").

purpose is something which Plaintiffs must prove to prevail.[5] *See General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 390-92, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) (observing that Equal Protection clause can be violated only by "purposeful discrimination"); *see also Church of Scientology v. City of Clearwater,* 2 F.3d 1514, 1525 (11th Cir.1993) ("Religious groups and their members that are singled out for discriminatory government treatment ... have standing to seek redress in federal courts"); *Jones v. White,* 992 F.2d 1548, 1573 (11th Cir.1993) ("To prevail on an equal protection claim that a facially neutral statute is being applied unequally, purposeful discrimination must be shown") (quotation marks omitted).

Defendants' first response to this charge is that the record supports no finding of discriminatory intent. But, we accept that Plaintiffs have presented a triable issue of fact on whether Defendants were motivated by a hostility toward the religion at the Holyland. In addition, we, for now, resolve this disputed issue by making an assumption in Plaintiffs' favor. So, the question becomes whether this assumption—that is, Defendants' acts were motivated some by prejudice against Plaintiffs' religion—is a bar

---

[5]But, many constitutional torts do not require the plaintiff to prove that the defendant possessed discriminatory intent in acting. For qualified immunity in such cases, no court doubts that *Harlow* 's test of objective reasonableness applies: The subjective intent of the government actor is unimportant to the resolution of the qualified immunity issue. The sole question is whether any reasonable official (regardless of subjective motive) could have acted as the defendant acted without violating clearly established law. For an example of such a constitutional tort, see Part II.B. (discussing family privacy claim).

to immunity.[6]

Sometimes a plaintiff has avoided summary judgment based on qualified immunity when an issue of fact existed about whether the defendants acted with subjective discriminatory intent where discriminatory intent was an element of the constitutional tort. *See, e.g., McMillian v. Johnson,* 88 F.3d 1554 (11th Cir.1996); *Ratliff v. DeKalb County,* 62 F.3d 338 (11th Cir.1995). Immunity (at the summary judgment stage) was denied despite *Harlow* 's admonition that qualified immunity requires not a subjective inquiry, but an objective inquiry. Our former decisions, however, must not be understood to rule out qualified immunity wherever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying

---

[6]We, in the past, have held state officials to be entitled to qualified immunity where a plaintiff alleged discriminatory intent and the summary judgment record showed discriminatory intent perhaps existed. *See Beauregard v. Olson,* 84 F.3d 1402 (11th Cir.1996) (court assumed defendant fired plaintiff because of political affiliation); *Bates v. Hunt,* 3 F.3d 374 (11th Cir.1993) (allegation—assumed to be true—of gender discrimination on pay and record showed that employer was, in fact, motivated, at least in part, by lawful consideration of work experience); *see also Zeigler v. Jackson,* 716 F.2d 847, 850 (11th Cir.1983) (individuals granted immunity on equal protection claim upon which plaintiff prevailed where defendants believed state law required them to act as they acted).

And, other courts have said that a state official is entitled to immunity where he had an arguable basis for thinking he was acting lawfully despite his treating the plaintiff adversely based on the class of persons to which plaintiff belongs or because the plaintiff had engaged in certain conduct. *See, e.g., Harrison & Burrowes Bridge v. Cuomo,* 981 F.2d 50, 61 (2d Cir.1992) (intentional discrimination on basis of race not plainly unlawful); *Henry v. Metropolitan Sewer Dist.,* 922 F.2d 332 (6th Cir.1990) (intentional discrimination on basis of union membership not plainly unlawful); *Wilson v. Schillinger,* 761 F.2d 921 (3d Cir.1985) (intentional discrimination on basis of religion not plainly unlawful).

constitutional tort.

Qualified immunity is too important a right of public servants and too important a public policy to be nullified so easily. The Supreme Court has not instructed us to drop qualified immunity (with its test of objective reasonableness) from cases in which discriminatory intent is an element of the underlying tort. *Cf. Anderson v. Creighton,* 483 U.S. 635, 645-46, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) ("*Harlow* clearly expressed the understanding that the general principle of qualified immunity it established would be applied "across the board.' "). So, whenever a public officer is sued for money damages in his individual capacity for violating federal law, the basic qualified immunity question looms unchanged: Could a reasonable officer have believed that what the defendant did might be lawful in the circumstances and in the light of the clearly established law?

When public officials do their jobs, it is a good thing. Qualified immunity is a real-world doctrine designed to allow local officials to act (without always erring on the side of caution) when action is required to discharge the duties of public office. *See Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984) ("[O]fficials should not always err on the side of caution."). For many public servants, a failure to act can have severe consequences for the citizenry. For example, if child welfare officials fail to act, the death or serious permanent injury of a child could be the result.

As we decide this case, we cannot forget the purpose of qualified immunity. The qualified immunity defense functions to

prevent public officials from being intimidated—by the threat of lawsuits which jeopardize the official and his family's welfare personally—from doing their jobs. Qualified immunity can be a muscular doctrine that impacts on the reality of the workaday world as long as judges remember that the central idea is this pragmatic one: officials can act without fear of harassing litigation only when they can reasonably anticipate—*before* they act or do not act—if their conduct will give rise to damage liability for them. *Davis,* 468 U.S. at 195, 104 S.Ct. at 3019-20. If objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages. *See Elder v. Holloway,* 510 U.S. 510, 513-15, 114 S.Ct. 1019, 1022, 127 L.Ed.2d 344 (1994). This lesson is at the heart of the rule of qualified immunity.

That state officials can act lawfully even when motivated by a dislike or hostility to certain protected behavior by a citizen is well established. *See Mt. Healthy v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1979). That state officials can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully is likewise well established. *See Vil. of Arlington Hts. v. Metro. Housing Dev.,* 429 U.S. 252, 269-71, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977). For example, state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent. *Mt. Healthy,* 429 U.S. at 286-87, 97 S.Ct.

at 576.

The *Mt. Healthy* doctrine is part of the law and, when the concept is presented by a defendant's argument, must not be overlooked in the qualified immunity analysis. [7] Where discriminatory intent is an element of the tort and the summary judgment record seems to show that discriminatory intent might have played a part in the state official's acts, the existence of the *Mt. Healthy* doctrine complicates and, therefore, can cloud the question of whether the official acted lawfully or unlawfully in the circumstances. This cloud, in turn, raises the possibility that even conduct which might ultimately be found to be unlawful was objectively reasonable when it was done.

One trigger to the doctrine's application depends upon whether the record establishes that the defendant, in fact, did possess a substantial lawful motive for acting as he did act. At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage. Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct—despite his having adequate lawful reasons to support the act—was the result of his unlawful motive, the defendant is entitled to immunity. Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful *and* unlawful

_____

[7] We are not the only circuit to recognize that *Mt. Healthy*-type concerns are important in interlocutory appeals from the denial of qualified immunity. See, for example, *Gehl Group v. Koby,* 63 F.3d 1528 (10th Cir.1995).

motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.

Given the undisputed facts in this case, the *Mt. Healthy* idea does obscure the answer for the question of whether Defendants acted lawfully or unlawfully in the circumstances.[8] Applying the usual summary judgment rules (Rule 56[c], [d] ), the record does show Defendants had, in fact, cause to understand that Teresa was possibly being mistreated. The record also shows Defendants were, in fact, aware of information that would warrant investigation of other children. These justifications for acting are lawful. *See Myers v. Morris,* 810 F.2d 1437, 1462-63 (8th Cir.1987); *Watterson*

---

[8]*Mt. Healthy* is not a case about qualified immunity. *Mt. Healthy* teaches about causation when the merits of a claim are to be decided. The concept it sets out is suggestive of a kind of balancing between (that is, to estimate the relative importance of) lawful causes and unlawful causes for an act. In this case, we put *Mt. Healthy* in the qualified immunity context: We try to take into account subjective intent and, at the same time, we try to advance and give credit to the principles which the Supreme Court has repeatedly said justify qualified immunity.

When the law contemplates some kind of balancing test to determine the ultimate question of lawfulness or unlawfulness of an act, qualified immunity almost always applies to shield the public servant defendant: the lack of bright lines associated with balancing tests prevents the preexisting law, given the circumstances of a specific case, from having been clearly established when the public servant took the step that resulted in his later being a defendant in a lawsuit. *See generally Hansen v. Soldenwagner,* 19 F.3d 573, 575 (11th Cir.1994).

The only question today before us is one of immunity. A decision on qualified immunity is separate and distinct from the merits of the case. We do not (and need not) decide that Defendants could not possibly be liable if the case were fully litigated to a conclusion on the merits, that is, if immunity were no issue at all in the case. And the case does involve some defendants and some claims for relief to which qualified immunity does not apply.

*v. Page,* 987 F.2d 1, 8 (1st Cir.1993); *see also* Part II.B. No jury could find that it would have been unlawful for a child custody worker to do as Defendants did *if* the worker lacked discriminatory intent. More important, no jury could find that reasonable child custody workers would never have done the things defendants did but for a discriminatory intent. In addition, the record makes it clear that Defendants' acts were actually motivated by lawful considerations without which they would not have acted.[9]

_____

[9]We know that matters of intent are often jury questions. But, even at summary judgment, "where the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff the [ ] court may properly acknowledge that fact...." *Young v. General Foods Corp.,* 840 F.2d 825, 830 (11th Cir.1988) (quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987)).

Because the record does establish that Defendants' acts, in fact, were motivated, in part at least, by lawful justifications, this case is materially different than *McMillian. See* 88 F.3d at 1564-65 (case in which district court [taking all of the reasonable inferences in plaintiff's favor] found, that is, assumed for the purpose of qualified immunity determinations, no legitimate reason, in fact, motivated defendants' acts). Given our precedents—whether they are right or wrong, the question for qualified immunity here cannot just be whether some official, acting without discriminatory intent, could have lawfully acted as Defendants acted. *McMillian* says that where intent is an element of the constitutional tort, the intent of the government official can be part of the circumstances which we are forced to consider. (But for our precedents allowing subjective intent to count in the qualified immunity context, defendants in this case would certainly be due immunity. *See Millspaugh v. County Dept. of Public Welfare,* 937 F.2d 1172, 1173 (7th Cir.1991).)

Given *Mt. Healthy's* teachings (part of the constitutional backdrop against which local officials decide whether an act which they think necessary is also lawful), we must consider the fact of lawful intent just as we consider the fact of unlawful intent. Here the record, in fact, shows substantial lawful intent, while not ruling out some unlawful intent, too. Unlike *McMillian* and *Ratliff* (which involved pointed district court fact findings—that we did not review—about the intent of the defendants and in

So, unless it was already clearly established when Defendants acted that no child custody worker could lawfully act—that is, do what Defendants did—to protect children in the circumstances of this case if the worker also acted, in part, out of hostility toward the parent's religion, Defendants are entitled to immunity. On the question of the legal consequences of the facts (proved in favor of defendants and assumed in favor of plaintiffs) in this case, Plaintiffs point us to no cases (and we have found none) which would have clearly established as a matter of law that child custody workers cannot act lawfully under these circumstances—even when we accept that the circumstances do include substantial prejudice by the officials against Plaintiffs on account of Plaintiffs' religious beliefs.[10]

In the circumstances, no clear legal standard could firmly

which the *Mt. Healthy* doctrine was not discussed), we are deciding the qualified immunity question based on circumstances which include indisputable and sufficient lawful motivations on the part of Defendants.

[10]Protecting children is the job for which social workers are paid. Never has the Supreme Court or this circuit or Alabama's appellate courts held that a social worker cannot act to protect children—when faced with circumstances that would warrant a pure-hearted reasonable person to act—if the particular social worker's motivations are, in fact, mixed, some lawful and some not. We cannot say the preexisting law was so clearly established, at the pertinent moment, that a social worker (who had unlawful motivations) would have known—even when faced with circumstances that would have justified a reasonable (and pure-hearted) social worker to act—that he, because some of his motivations were not right, had to turn away and not to act on behalf of the children *if he wished to avoid violating federal law.* And, as we understand it, unless the law was to that degree clearly established (that is, so clearly established that the pertinent, partially bad-hearted, social worker would be acting lawfully only if he did not act in defense of the children—given the particular social worker's subjective feelings), the Supreme Court's teachings on qualified immunity say the social worker is due immunity.

direct Defendants when the time to act or not to act was upon them. Because, given the circumstances and the state of the law, a reasonable child custody worker could have considered Defendants' conduct arguably proper even if Defendants were motivated in substantial part by unlawful motives, Defendants' conduct was objectively reasonable for the purposes of qualified immunity. Defendants are entitled to summary judgment based on qualified immunity on this disparate treatment claim.

### B. Family Liberty

Plaintiffs have alleged violations of their right to "freedom of association," which we construe to include a claim that their rights to preserve their family unit have been violated. *See Lehr v. Robertson,* 463 U.S. 248, 258, 103 S.Ct. 2985, 2991-92, 77 L.Ed.2d 614 (1983) ("[t]he relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection"). Plaintiffs also allege a free exercise violation. Family-oriented liberty rights can involve the right to raise children in accordance with certain religious teachings. *See Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944).

To prevail on a claim about family privacy, parents need to prove that a state actor interfered with a protected liberty interest without sufficient justification. This constitutional tort requires no element of intent. For example, no showing need be made that the state official acted out of a hostility toward the family unit or toward protected religious behavior engaged in by the family. *Cf. Canas-Segovia v. INS,* 902 F.2d 717, 723 n. 12 (9th

Cir.1990), *vacated on other grounds,* 502 U.S. 1086, 112 S.Ct. 1152, 117 L.Ed.2d 401 (1992) (observing that equal protection cases are different from freedom of religion cases because equal protection cases "require[ ] proof of discriminatory intent"). So, as we have discussed in note 5, the qualified immunity question on this claim is whether *any* reasonable officer (that is, one without hostility toward Plaintiffs' religion or family) could have acted as these Defendants acted without violating federal law.

Family relationships are an area of state concern, and the state has a compelling interest in removing children who may be abused. *See Myers v. Morris,* 810 F.2d 1437, 1462 (8th Cir.1987). Likewise, "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." *Watterson v. Page,* 987 F.2d 1, 8 (1st Cir.1993). Violations of the right to family association are determined by a balancing of competing interests. *Manzano v. South Dakota Dep't of Social Servs.,* 60 F.3d 505 (8th Cir.1995). So, state officials who act to investigate or to protect children where there are allegations of abuse almost never act within the contours of "clearly established law." *See Frazier v. Bailey,* 957 F.2d 920, 931 (1st Cir.1992). Thus, it is no surprise that state officials who investigate allegations of child abuse and in so doing disrupt a family have been entitled to qualified immunity. *See, e.g., Thomason v. SCAN Volunteer Services,* 85 F.3d 1365 (8th Cir.1996); *Manzano,* 60 F.3d at 511; *Watterson,* 987 F.2d at 8; *Frazier,* 957 F.2d at 931; *Myers,* 810 F.2d at 1462; *Backlund v. Barnhart,* 778 F.2d 1386 (9th Cir.1985) (foster parents claim free exercise right to use corporal

punishment).

Here, the record is undisputed that Teresa (1) alleged abuse by her parents, (2) had bruises on her arm, (3) said she did not wish to return to her parents, and (4) threatened suicide. Monica also alleged abuse which was supported by the doctor's exam. And, each girl alleged that they were not the only children abused by Holyland adults. (We do not conclude the record proves child abuse, in fact.) Under the circumstances, no clearly established right to family privacy has been shown to have been violated by the conduct of Defendants. This conclusion is so even if the investigation and custody determination procedures were not "textbook perfect." *See Manzano,* 60 F.3d at 513 (citing *Watterson,* 987 F.2d at 8). As such, the district court should have granted the Defendant's motion for summary judgment on these claims (as well as all others).

In sum, we reverse the order denying Defendants summary judgment based on qualified immunity. We remand and instruct that the district court grant each individual defendant summary judgment from the claims which seek to hold an individual defendant personally liable for money. The only issue in this appeal is the issue of qualified immunity; so, we also remand for further proceedings.

REVERSED and REMANDED.