United States Court of Appeals,

Eleventh Circuit.

No. 96-4538.

Herbert JOHNSON, Plaintiff-Appellee,

v.

CITY OF FORT LAUDERDALE, FLORIDA, a Florida Municipal Corporation, Defendant,

James Sparr, Rick Earle, Dennis Sheehan, Keith Allen and Ron Pritchard, in their individual capacities, Defendants-Appellants.

Nov. 5, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 94-7240-CV-JAG), Jose Gonzalez, Judge.

Before COX and BARKETT, Circuit Judges, and SMITH[*], Senior Circuit Judge.

COX, Circuit Judge:

James Sparr, Ron Pritchard, Rick Earle, Dennis Sheehan, and Keith Allen ("defendants") appeal the district court's adverse ruling on their qualified immunity defenses in this civil rights action filed by Herbert Johnson ("Johnson"). For the reasons that follow, we affirm in part and reverse in part.

I. BACKGROUND

The following background is derived primarily from the record as reflected in the parties' statements of facts. This being so, we pause to emphasize attorneys' obligations under Federal Rule of Appellate Procedure 28 generally and in the specific context of a qualified immunity appeal.[1]

---

[*]Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

[1]We take this opportunity also to note an important aspect of Eleventh Circuit Rule 28. It provides in part that a "proper statement of facts reflects a high standard of professionalism. It must state the facts accurately, those favorable and those unfavorable to the party. Inferences drawn from facts must be identified as such." 11TH CIR. R. 28-2(I)(ii). It appears that both sides in this case have disregarded this rule. For example, the defendants' brief does not include facts unfavorable to the defendants' position. Johnson's brief reflects the same problem and, additionally, does not identify inferences drawn from facts, even where those inferences are quite attenuated or simply unfounded. Although his brief states that "Johnson was subjected to racial slurs by ... Earle," *see* Answer Brief of Appellee at 9, the portion of the record corresponding to the brief's citation states only that Earle disregarded a racial slur made in his

Rule 28 requires appellants to submit a statement of relevant facts with corresponding record cites and requires appellees to do the same if dissatisfied with the appellants' version. *See* FED. R.APP. P. 28(a)(4) & 28(b)(3). These requirements are not to be taken lightly, especially since we are not obligated to cull the record ourselves in search of facts not included in the statements of fact. In the specific context of a qualified immunity appeal, this means that plaintiffs must, if dissatisfied with the defendants' statement of facts, carefully set out the facts which, if proven, would constitute violations of clearly established law on the part of each defendant.[2]

Turning from this aside, we now state the facts. The defendants are current or former employees of the City of Fort Lauderdale Fire Department. Sparr served as Fire Chief from October 19, 1987, to January 31, 1993. Pritchard served as Acting Fire Chief from January 31, 1993, to March 14, 1994. In those capacities, Sparr and Pritchard had the authority to recommend to the City Manager that employees be promoted, disciplined, and discharged. Earle, Sheehan, and Allen served in other management capacities. They had the authority to evaluate the work performances of and make personnel recommendations regarding subordinate employees.

In 1983, the City hired Johnson, a black male, to work as a Firefighter under the management of the defendants. In 1987, the City promoted Johnson from Firefighter to Driver/Engineer, and, in 1989, the City further promoted Johnson to Fire Lieutenant. This second promotion was based on a recommendation from Sparr despite the fact that Johnson earlier in 1989 had received a three-day suspension without pay for refusing to obey a direct order from a supervisor on the proper route to

---

presence. Further, although his brief states that Johnson "was an outspoken critic within the Department on issues involving affirmative action and the Department's failure to hire and/or promote African Americans," *see id.* at 8, the portion of the record corresponding to the brief's citation says nothing about criticism on affirmative action and hiring/promotion practices. Additionally, although his brief says that Dennis Sheehan made a racial comment in 1984, *see id.* at 38, the portion of the record corresponding to the brief's citation reflects that a person by a different name made the comment. Certainly, the omissions in both of the briefs do not demonstrate the "high standard professionalism" called for by the rule.

[2]This obligation on the part of the plaintiff is particularly important in a case where, as here, the district court has made no findings of fact about the conduct of each defendant.

follow to get to a fire scene and despite the fact that three white males had higher overall scores than Johnson on the competitive Civil Service examination.

Roughly three years after this second promotion, the City demoted Johnson to his previous position as Driver/Engineer following a "Firefighters Bill of Rights" hearing attended by Johnson, Allen, and Earle on an accusation that Johnson disobeyed a direct order to lay two lines of hose at a fire scene, used profane language, and threatened a subordinate officer, all in violation of the Fire Department's Administrative Rules and Regulations. The hearing was held pursuant to Florida law, which outlines procedural requirements for interrogating Firefighters. *See* Fla. Stat. ch. 112.82 (1995).

The hearing transcripts show that Johnson admitted to having been ordered to lay two lines of hose, but denied having disobeyed a direct order when he laid only one line of hose, contending instead that he properly exercised his discretion because he did not have enough hose on the truck to lay two lines. The transcripts also show that Johnson denied having threatened a subordinate officer. In a letter notifying Johnson of his demotion, Sparr acknowledged this denial, but noted that the threat had been witnessed by another Department employee.

After the City filled the Fire Lieutenant vacancy created by Johnson's demotion with another black male, Johnson filed a charge with the Equal Employment Opportunity Commission (EEOC). The charge alleged that the City (1) subjected Johnson to stricter scrutiny and discipline because of his race; and (2) demoted and replaced him with a lesser qualified black employee so that no black employee could be promoted from Fire Lieutenant to Battalion Chief. Although Johnson claims that he was the only black male eligible for the Battalion Chief position at the time that he was a Fire Lieutenant, City Personnel Records show that Johnson was not eligible at that time since he did not possess a bachelor's degree—a prerequisite for the Battalion Chief position under the City Personnel Rules. City Personnel Records also show that Johnson was the first black employee in the Department to have been demoted by the City.

3

On August 7, 1992, before the EEOC issued its determination on the charge, Sparr attempted to send Johnson a time-sensitive certified letter regarding an appeal of his demotion. The letter was addressed to a Lauderdale Lakes address—the address maintained on file with the Fire Department as Johnson's current address. On August 20, 1992, the letter was returned undelivered with a Lauderhill address having been written on the envelope by a postal delivery person.

On August 20 and 21, 1992, a Battalion Chief attempted to contact Johnson about the letter by phone, but was unsuccessful. He then attempted to hand deliver the letter to the Lauderdale Lakes address. The occupant at that address stated that she had lived there since the July 4th weekend and that Johnson did not currently live there. The Battalion Chief then attempted to hand deliver the letter to the Lauderhill address. There, the Battalion Chief recognized Johnson's pick-up truck and was led to an apartment by a child who asked if the Battalion Chief, dressed in firefighter garb, was looking for the other firefighter. The Battalion Chief knocked on the apartment's door several times but no one answered.

On August 21, 1992, Johnson called the Department and told the Battalion Chief that he would be in later that day to pick up the letter. When Johnson arrived, the Battalion Chief asked him which of the addresses written on the undelivered certified letter was his current address. Johnson replied that the Lauderdale Lakes address was still his current address. However, on August 27, 1992, Johnson submitted a memorandum to the Fire Department notifying it of a change of address, from the Lauderdale Lakes address then on file to the Lauderhill address written on the undelivered certified letter.

According to the Department, the events related to the certified letter, Johnson's statements to the Battalion Chief, and Johnson's statements in his memorandum raised suspicions that Johnson had violated a Department Administrative Rule and Regulation requiring employees to submit a change of address or residency within 24 hours so that they can be reached on short notice in the event of an emergency. Therefore, on October 27, 1992, the Department held another "Firefighters Bill of Rights" hearing, this time "to obtain information from [Johnson] relating to a possible

4

[change-of-address violation.]"  (R.5-53 app.  E at 2.) Johnson, Allen, Sheehan, and attorneys representing Johnson and the City attended the hearing.

According to hearing transcripts, Johnson stated that he began moving from the Lauderdale Lakes address to the Lauderhill address on August 21 or 22, and finished moving on August 31.  He also stated that he "resided" at the Lauderdale Lakes address until August 31, although he possibly "lived someplace else" between August 21 and 27.  (R.5-53 app.  E at 7.) When asked to explain why the occupant at the Lauderdale Lakes address told the Battalion Chief on August 20 that she had lived there since the July 4th weekend and that Johnson did not live there, Johnson responded, "I have to do a little investigating myself.  It could be a little personal matter that does not need to be here on the tape.  All I can say is we have on record that that was my actual address.... It was my residence."  (R.5-53 app.  E at 26.)

Toward the end of the hearing, Johnson's attorney asked if the Department had ever previously investigated a possible change-of-address violation.  Both Allen and Sheehan asserted that such investigations had taken place.  The hearing then was adjourned to allow further investigation.

Allen proceeded to investigate on behalf of the Department.  He contacted Roger Haberkorn, the real estate manager of the house corresponding to the Lauderdale Lakes address.  Haberkorn told Allen that Johnson had been evicted in May, 1992, and owed George Sears, the absentee owner of the house, money in back rent.  Allen obtained a copy of a default judgment against Johnson for the past rent due and a copy of the court order evicting Johnson from the house.

On November 13, 1992, while the investigation was going on, Johnson filed a second charge with the EEOC against the City. This charge alleged that the Department had subjected Johnson to increased racial harassment and discrimination for filing the first EEOC charge.

On November 20, 1992, before the EEOC issued a determination on this and the previous charge, the Department held a second hearing, this time to address both the allegation that Johnson had committed a change-of-address violation and an allegation that Johnson had been untruthful in

his earlier testimony. Johnson, Allen, Sheehan, and attorneys for Johnson and the City attended the hearing.

According to hearing transcripts, Johnson was told about Haberkorn's statements and was given the court documents. Johnson reasserted that he had been residing at the house as late as August 27, 1992, and added that he had a secret arrangement with Sears to continue living at the house after the May eviction. He also stated that the eviction papers were never "finalized" and never received. (R.5-53 app. G at 6.) At the request of Johnson's attorney, the hearing was adjourned to investigate Johnson's new claims.

Allen subsequently contacted Sears by telephone. Sears denied having any secret arrangement with Johnson and confirmed that Johnson had been evicted in May. At Allen's request, Sears prepared and submitted a sworn statement explaining his landlord/tenant relationship with Johnson.

On February 15, 1993, the Department held a third hearing, attended by Johnson, Allen, attorneys for Johnson and the City, and initially by Sheehan. According to hearing transcripts, Johnson was told about Sears's denial of any secret arrangement and shown Sears's sworn statement. In response, Johnson's attorney explained that Johnson "was still residing [at the Lauderdale Lakes address] up until late August.... [His] belongings were there. [His] mail was delivered there, and [his] pets were still there." (R.5-53 app. K at 26.) He also produced a typewritten letter signed with the name "Brenda Little." The letter stated that as of July, 1992, "Brenda Little" considered herself a "temporary resident" of the Lauderdale Lakes address "with the acknowledgment of ... Johnson who then relocated to another address in late August of [19]92 or the early part of September" and that since then, she had been receiving Johnson's mail from time to time and notifying him about the mail. (R.5-53 app. J.) The letter further stated that "Brenda Little" had not spoken with any Department representative except for Johnson on, before, or after August 21, 1992. According to Johnson's attorney, the letter indicated that while Johnson "may not have been legally a lessee on

6

the premises, he was living there." (R.5-53 app. K at 48.) The hearing then was adjourned to investigate this new information.

Allen contacted the then-current residents of the Lauderdale Lakes house whose names were Edna Little and Brenda Fayson. Little explained that she and Fayson had moved into the house during the July 4th weekend and provided Allen with a copy of the lease agreement. Both Little and Fayson denied having written the letter that Johnson's attorney had produced at the third hearing and stated that Johnson had never lived with them at the house, although he would occasionally pick up his mail there. According to the Department, this information provided reasonable cause to believe that Johnson had forged the letter signed by "Brenda Little." The Department therefore suspended Johnson with pay pending a resolution.

On March 22, 1993, the Department held a fourth and final hearing, attended by Johnson, a Division Chief, a Battalion Chief, the City's Assistant Employee Relations Director, and attorneys for Johnson and the City. According to hearing transcripts, Johnson stated that Little and Fayson were lying about him not having lived at the house since the July 4th weekend and about not having written the letter. Johnson's attorney requested a chance to contact Little and Fayson to clear up the discrepancies between their story and Johnson's and to provide documentary evidence to support Johnson's story. This request was granted and the hearing was adjourned.

On April 10, 1993, after Johnson failed to produce new information or documents, the City suspended him without pay, and, on April 30, 1993, the City discharged him.

After this discharge, Johnson applied for unemployment compensation benefits with the State of Florida. At four adversarial administrative hearings, Johnson maintained that he had done nothing wrong and that he had been demoted and later discharged because of his race. The unemployment appeals referee concluded that Johnson was not a credible witness and ruled that he was not entitled to benefits because he was properly discharged for repeatedly lying to his supervisors. The Unemployment Appeals Commission affirmed the referee's decision.

The EEOC reached similar conclusions in its determinations on Johnson's two charges. By letter dated September 20, 1994, it concluded that (1) Johnson was demoted and discharged for failing to meet the Department's standards of conduct; and (2) the evidence did not show that Johnson was treated differently or harassed because of his race or prior charge.

Soon after this EEOC letter was issued, Johnson sued the defendants in their individual capacities[3] claiming (1) racial discrimination, harassment, and retaliation under 42 U.S.C. § 1981; (2) racial discrimination and harassment in violation of the Fourteenth Amendment under 42 U.S.C. § 1983; (3) retaliation for speech and complaints of racial discrimination in violation of the First Amendment under § 1983; and (4) conspiracy to deprive Johnson of his § 1981 and Thirteenth Amendment rights under 42 U.S.C. § 1985(3).[4]

Before discovery, the defendants moved for summary judgment, asserting that they were entitled to qualified immunity on all of Johnson's claims. In support of the motion, they submitted several sworn affidavits and documentary exhibits which essentially summarized the disciplinary proceedings that resulted in Johnson's demotion and eventual discharge. Johnson responded with an unsworn declaration, signed pursuant to 28 U.S.C. § 1746, which addressed four areas: the demotion, the discharge, specific instances of racial discrimination and harassment within the Department, and Johnson's "outspoken" nature.

The declaration states that the reasons given for Johnson's demotion—that he disobeyed a direct order to lay two lines of hose and threatened a subordinate officer at a fire scene—were pretextual and unsupported by direct evidence. According to the declaration, Johnson was unsure

---

[3]Johnson also sued the City under 42 U.S.C. § 1983 and 42 U.S.C. § 2000e (Title VII). Those claims are not involved in this appeal.

[4]Johnson's complaint is the type of "shotgun pleading" we bemoaned in *Ebrahimi v. City of Huntsville Bd. of Educ.,* 114 F.3d 162 (11th Cir.1997). It is difficult to figure out from the complaint what discrete claims Johnson asserts and impossible to determine the factual bases for the discrete claims since each of the complaint's nine counts incorporates *all* of the factual allegations of earlier counts. Further, although the complaint apparently alleges a general retaliation claim under the Equal Protection Clause and a retaliation claim under the First Amendment for filing his EEOC charges, Johnson asserts in his reply brief that it does not, in fact, allege such claims.

about whether he was ordered to lay one line or two lines since radio communication at the fire scene was "chaotic" and since he was ordered to lay one line of hose on more than one occasion. Because of this confusion, Johnson laid only one line of hose, an action supported by the Department's Rules and Regulations and the Department's Treatise on Firefighter Procedure.

The declaration states that the reasons given for Johnson's discharge were, like the reasons given for the demotion, pretextual and unsupported by direct evidence. According to the declaration, the Department had never before held a hearing on a change-of-address violation, and investigated his alleged change-of-address violation "with a fervor unheard of in investigations of white firefighters." The declaration also states that (1) Johnson never claimed to have "physically" lived at the Lauderdale Lakes house in August, 1992; (2) Johnson had never actually received eviction papers from the Lauderdale Lakes house; (3) Johnson's Lauderdale Lakes rental contract was with Anthony Sears, not George Sears—the man who claimed to have a landlord/tenant relationship with Johnson; (4) Johnson presented the "Brenda Little" letter to the women who were living at the Lauderdale Lakes address and had it signed by "Brenda Little;" and (5) the Department never conducted a handwriting analysis to determine if the "Brenda Little" signature was a forgery.

The declaration additionally details specific instances in which Johnson and other black firefighters were subjected to racial slurs by persons other than the defendants. According to the declaration, Earle heard such a slur on one occasion but refused to take remedial action. This occurred when Earle summoned then-Lieutenant Johnson and another Lieutenant into his office to discuss a memorandum written by Johnson. When the discussion became heated, the other Lieutenant called Johnson "the nigger." When Johnson protested the slur, Earle told Johnson that "this is the way it has been for a long time[,] this is the way it will always be around the Department[,] and ... [Johnson] had to accept it." (R.6-68 at 6.) Also according to the declaration, Johnson complained to Sparr about racial slurs, and, although Sparr promised to investigate, nothing ever was done.

9

The declaration further states that Johnson and other black employees were subjected to disparate treatment by some of the defendants and by the Department generally. In support of this statement, the declaration relates an occasion that occurred after Johnson's demotion. On that occasion, Allen told Johnson that he was not allowed to wear union-issued and other uniform shirts bearing his rank and specific technical field while on duty, even though similarly situated white employees were allowed to wear such shirts. The declaration also states that on other occasions, Sheehan, Allen, and Earle told Johnson that the rules governing officer titles did not apply to him.[5]

The declaration concludes by stating that Johnson was "outspoken about the treatment of other African Americans in the [D]epartment when [he] was a member of the International Black Firefighter's Union." (R.6-68 at 12.)

The district court considered Johnson's declaration and the defendants' affidavits and exhibits and denied the defendants' motion for summary judgment without explicitly addressing qualified immunity and without explicitly differentiating among claims and defendants. Instead, its order merely discussed the summary judgment standard, noted that the parties "presented wildly conflicting evidence," and concluded that "disputed issues ... must be resolved by a jury." (R.7-78 at 3.) The defendants moved the district court to alter or amend its denial, partially on the basis that it seemingly did not engage in the requisite qualified immunity analysis. After summary denial of that motion, the defendants filed a notice of appeal. They raise one issue: whether the district court's adverse ruling on their qualified immunity defenses, implicit in its denial of their summary judgment motion, was erroneous.

## II. DISCUSSION

In *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Supreme Court described the analytical framework for determining whether a plaintiff's allegations are

---

[5]We do not interpret Johnson's complaint to include discrete discrimination, harassment, and retaliation claims against the individual defendants based on the shirt and officer title incidents. *See supra* note 4.

10

sufficient to overcome a defendants' summary judgment motion predicated on qualified immunity.[6] As a threshold matter, the court must determine whether the plaintiff has presented a violation of a constitutional or statutory right. *See id.* at 231, 111 S.Ct. at 1792-93. If so, the court next must determine whether the defendant's conduct was nonetheless "objectively reasonable" in light of that right. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). In making this determination, the court must resolve all factual disputes about the defendant's conduct in favor of the plaintiff. *See Johnson v. Jones,* 515 U.S. 304, 317-20, 115 S.Ct. 2151, 2159, 132 L.Ed.2d 238 (1995); *Foy v. Holston,* 94 F.3d 1528, 1530 n. 1 (11th Cir.1996). If the court determines that "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances, summary judgment for the [defendant] is appropriate." *See Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995); *Foy,* 94 F.3d at 1535.[7]

Johnson alleges that the defendants violated his equal protection, free speech, and § 1981 rights by demoting him and discharging him because of his race and because he was "outspoken about the treatment of other African American" Department employees. The defendants do not dispute that, as a threshold matter, the right to be free from workplace discrimination and harassment on the basis of race and the right to be free from retaliation for complaining about general workplace racial discrimination were clearly established at the relevant times. They argue, however, that even assuming their conduct in demoting and discharging Johnson was based in part on unlawful discriminatory and retaliatory motives, their conduct was nonetheless "objectively reasonable" since it also was based on indisputable and adequate lawful motives as well—specifically, Johnson's

---

[6]Several of our prior opinions discuss in-depth the qualified immunity defense. *See, e.g., Foy v. Holston,* 94 F.3d 1528, 1532-34 (11th Cir.1996); *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149-50 (11th Cir.1994)(en banc). We need not duplicate those discussions here.

[7]These determinations present questions of law resolved de novo on appeal. *See Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994). We have jurisdiction to address both determinations. *See Foy,* 94 F.3d at 1531 n. 3.

admitted failure to obey a direct order at a major fire scene and repeated lies during his disciplinary hearings.

The defendants rely primarily on *Foy,* 94 F.3d at 1528, to support their argument. In *Foy,* the parents of children removed or threatened to be removed from a religious community sued the responsible state social service employees, claiming religious discrimination in violation of their free speech, free exercise of religion, and equal protection rights. In response, the employees moved for summary judgment based on qualified immunity and proffered evidence showing that the children were being mistreated.

On appeal of the district court's denial of that motion, we assumed that the employees were motivated in part by substantial prejudice, but held that they nonetheless were entitled to qualified immunity since their conduct was "objectively reasonable" in light of the doctrines enunciated in *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 284-87, 97 S.Ct. 568, 574-76, 50 L.Ed.2d 471 (1977)(holding that state official can act lawfully even when motivated by a dislike for protected behavior); and *Village of Arlington Hts. v. Metropolitan Housing Dev.,* 429 U.S. 252, 269-71, 97 S.Ct. 555, 565-66, 50 L.Ed.2d 450 (1977)(holding that state official can act lawfully even when motivated by hostility toward a certain protected class). *See id.* at 1536. While their conduct may have been partially based on prejudice, it also was based on an indisputable and "adequate" lawful motive—evidence of child mistreatment—and "no jury could find that a reasonable [social service employee] would never have done the things [the employees] did but for a discriminatory intent." *See id.*

The holding in *Foy* rested primarily on the existence of an indisputable and adequate lawful motive on the part of the social service employees such that reasonable officials would disagree as to the legality of their conduct in light of the *Mt. Healthy* and *Arlington Hts.* doctrines. Here, the transcripts of the disciplinary hearings against Johnson offer conclusive support for the defendants' claimed adequate lawful motives for demoting and discharging Johnson. They show that Johnson admitted to having been ordered to lay two lines of hose at a major fire scene, to having been

12

reminded of this order by a subordinate officer, and to having nonetheless laid only one line of hose because he did not think that enough line was on the fire truck to lay two lines.[8] They also show that the defendants had more than sufficient reason to believe that Johnson lied and fabricated evidence in the course of a disciplinary proceeding.[9] Even assuming that the defendants acted with some discriminatory or retaliatory motives in demoting and discharging Johnson, the law did not clearly establish that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined Johnson in the same manner. We therefore reverse the district court's denial of summary judgment on Johnson's § 1981 and § 1983 claims.

We do not, however, reverse the district court's denial of summary judgment on Johnson's § 1985(3) claim. The elements of a § 1985(3) claim are:

> (1) a conspiracy; (2) for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*See United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott,* 463 U.S. 825, 828-29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983).

We have squarely held that qualified immunity is not available as a defense to a § 1985(3) claim, *see Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 794 (11th Cir.1992), and are not swayed by the defendants' argument that *Burrell* is no longer legally viable in light of *Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146 (11th Cir.1994)(en banc). *Lassiter* does not undermine *Burrell's* central rationale: that the narrow intent element of § 1985(3) erects

---

[8]Johnson attempts to put these facts in dispute by stating in his unsworn declaration that he was unsure about whether he was ordered to lay one line or two lines since radio communication at the fire scene was "chaotic" and since he was ordered to lay one line of hose on more than one occasion. (R.6-68 at 7.) Johnson cannot avoid qualified immunity at summary judgment by proffering testimony that conflicts with his prior testimony. *See Prosser v. Ross,* 70 F.3d 1005, 1008-09 (8th Cir.1995).

[9]It is undisputed that, under the City Personnel Rules, an employee can be disciplined for violating any order or direction when the violation amounts to either insubordination or a serious breach of proper discipline, for making false statements of material facts, or for attempting to practice any deception on the City.

a significant hurdle for § 1985(3) plaintiffs, thereby obviating the need for granting public officials qualified immunity with respect to a § 1985(3) claim.[10]

## III. CONCLUSION

We affirm the district court's denial of summary judgment as to Johnson's § 1985(3) conspiracy claim. We reverse the district court's denial of summary judgment on Johnson's § 1981 and § 1983 claims insofar as those claims seek to hold the defendants individually liable for money damages. We remand the case for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.

---

[10]The defendants additionally argue that *Burrell* is no longer legally viable in light of *Foy,* 94 F.3d at 1528, and *Edwards v. Wallace Community College,* 49 F.3d 1517 (11th Cir.1995).

This argument effectively asks us to hold that two subsequent panel opinions can implicitly overrule a prior panel opinion. Such a holding would run contrary to *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209-10 (11th Cir.1981)(en banc)(holding that precedent set by our panels binds all subsequent panels).