Kenneth BUZZI, et al., Plaintiffs,

v.

Lieutenant Ricardo GOMEZ, individually, et al., Defendants.

No. 96–3492–CIV.

United States District Court, S.D. Florida.

Sept. 28, 1998.

David Chonin, Chonin, Sher & Navarrete, P.A., Coral Gables, FL, for Kenneth Buzzi, et al.

Thomas A. Tucker Ronzetti, Asst. County Atty., Miami, FL, for Metropolitan Dade County, Carlos Alvarez.

Rick Diaz, Miami, FL, for Richard Gomez.

### *ORDER GRANTING DEFENDANT CARLOS ALVAREZ'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW*

GOLD, District Judge.

THIS CAUSE came before the Court upon Defendant Carlos Alvarez's Motion for Summary Judgment and Incorporated Memorandum of Law [D.E. # 66]. Plaintiffs brought this suit against Defendants Metropolitan Dade County ("Metro–Dade"), Carlos Alvarez, individually ("Alvarez"), and Lieutenant Ricardo Gomez, individually ("Gomez"). Plaintiffs filed a twenty-one count amended complaint, alleging they were subjected to racial and national origin discrimination. Counts I through VII state causes of action against Defendant Gomez, pursuant to 42 U.S.C. §§ 1981 and 1983 (1994). Counts VIII through XIV state causes of action against Defendant Alvarez, pursuant to 42 U.S.C. §§ 1981 and 1983. Counts XV through XXI state causes of action against Defendant Metro–Dade, for violations of Title VII, 42 U.S.C. § 2000e *et seq.* Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as arising under federal law.

Defendant Alvarez, sued in his individual capacity, moved for summary judgment, claiming that he is entitled to qualified immunity. Alvarez bases his entitlement to immunity on three factors: (1) that he was acting within the scope of his discretionary authority as a public official when the allegedly wrongful acts occurred; (2) that he did not violate a clearly established constitutional or statutory right of which a reasonable person would have known; and (3) that there is no showing of an intent to discriminate on Alvarez's part. Plaintiffs disagree. After careful consideration of the parties' arguments, the relevant case law, and the record as a whole, this Court concludes that Alvarez is qualifiedly immune from liability in his individual

capacity, and therefore, his motion for summary judgment should be granted.

## I. Findings of Fact and Procedural Background

Only counts VIII through XIV of Plaintiffs' Complaint assert claims against Alvarez. Therefore, the inferences raised only by the facts set forth in those counts, viewed in the light favorable to the Plaintiffs, are considered relevant for purposes of summary judgment. Those pertinent facts reveal the following.

Plaintiffs are former and present officers of the Metro–Dade Police Department ("MDPD"). Officers Kenneth Buzzi ("Buzzi"), Dante Fonseca ("Fonseca"), Jeff Frau ("Frau"), Boyd Gans ("Gans"), Steve Leibowitz ("Leibowitz"), Jimmy Ratcliff ("Ratcliff"), and Kenneth West ("West"), all claim that Alvarez participated in discriminatory conduct that resulted in employment actions that adversely affected these officers. Specifically, Plaintiffs allege that their former supervisor, Lieutenant Gomez, orchestrated a scheme to systematically transfer them from, or alternatively, blocked their transfer into, assignments at the Airport District because they were not Cuban. Plaintiffs aver that, as a result of their non-Cuban heritage, they were victims of national origin discrimination, which deprived them of constitutional rights in violation of the Equal Protection Clause of the Fourteenth Amendment.[1] Alvarez, it is alleged, is liable for these deprivations because, as the Assistant Director of the MDPD, he failed to intervene and take action to correct the unlawful discriminatory practices that were being inflicted on the white and non-Cuban employees at the Airport District.

All Plaintiffs were long-term employees of the MDPD. Buzzi, Gans, Leibowitz, Ratcliff, and West, are white males. Fonseca and Frau are non-Cuban Hispanic males. All Plaintiffs were either assigned to units at the Airport District, or were eligible for such assignment. The record indicates that the Airport District is a coveted assignment, providing low risk and bountiful overtime. Therefore, incoming transfers are based on seniority and superior qualifications. Because the Aviation Department, not the MDPD, pays the salaries of the officers at the Airport District, the Aviation Department pressures the MDPD to ensure officers are productive and professional.

In January of 1994, Gomez, a Cuban–American male, was appointed to the position of Lieutenant of the General Investigation Unit at the Airport District (the "GUI"). As such, Gomez was Plaintiffs' immediate supervisor. Plaintiffs accuse Gomez of employing a scheme to "ethnically cleanse" the Airport District. As part of this scheme, Gomez harassed non-Cuban officers of the Airport District to force their transfers to other Districts. Plaintiffs also claim that Gomez blocked incoming transfers of qualified non-Cuban officers while accepting less-qualified, Cuban transferees. To effectuate this scheme, Plaintiffs allege that Gomez used offensive ethnic slurs, used favoritism in shift and task assignments, gave Plaintiffs adverse, unjustified evaluations, and constantly belittled and degraded Plaintiffs. This unprofessional and offensive behavior created a hostile environment that Plaintiffs contend was based on their non-Cuban national origin.

Daily operations at the Airport District are run by a district commander, an executive officer, and the heads of the several units, including the head of the GUI, Gomez. At all times relevant to Plaintiffs' claims, Major John Ford was District Commander and Captain James Montgomery was Executive Officer of the Airport District. Both of these officers are white males. In the chain of command, Gomez reported to Captain Montgomery, who reported to Major Ford. Major Ford reported to the division chief.[2] The

---

**1.** Although Plaintiffs also brought their actions pursuant to 42 U.S.C. § 1981, that section only addresses racially-based discrimination. None of the testimony or statements made to the Equal Employment Opportunity Commission references discrimination based on Plaintiffs' race. Thus, the dispositive analysis for Alvarez's motion is that applied to actions brought under 42

U.S.C. § 1983. However, the same analysis could be applied to § 1981 claims.

**2.** Chief Diane Paull was appointed Division Chief in December of 1994. It is unclear who was her immediate predecessor. However, this detail is immaterial to the allegations against Alvarez, since there is no claim that Plaintiffs approached

division chief reported to the Assistant Director of Police Services, Alvarez.

As Assistant Director, Alvarez was in charge of uniform functions in all eight of the then existing districts. Each district had approximately 200 employees, except for the Airport District, which was comprised of 100 employees. Therefore, Alvarez was in charge of an estimated 1,700 to 2,000 employees. However, his responsibilities did not include the day-to-day operations of the respective districts. Instead, he relied on the district commanders, executive officers, and division chiefs to handle daily operations and to keep him apprised of matters commensurate with his oversight functions.

Plaintiffs claim that immediately upon Gomez's appointment in January 1994, the environment at the Airport District became hostile. Gomez instituted changes affecting assignments, shifts, and days off. According to Plaintiffs, the adverse effects of these changes were felt only by non-Cuban personnel. Plaintiffs were among those victimized by the disruptive changes. They claim that it was Gomez's intent to create an unbearable environment that would lead to the exodus of non-Cuban officers, enabling Gomez to fill these vacant slots with Cuban officers. In some instances, Plaintiffs claim they were involuntarily transferred if they did not succumb to Gomez's plan. Pursuant to MDPD protocol, all transfers were ratified by Captain Montgomery, following explanation by Gomez.

Although Plaintiffs felt the adverse effects of Gomez's leadership from as early as January of 1994, Plaintiffs did not report what they perceived as clearly unlawful treatment until the end of October, 1994, when Ratcliff met with a counselor for the MDPD's Psychological Services, Pamela Stephens. Ratcliff's meeting with Stephens was prompted by meetings he had with Gomez and Captain Montgomery in mid-September, 1994. In the September 11, 1994 meeting, Gomez told Ratcliff that, because of his unsatisfactory productivity, he should look for an assignment outside the GUI. Ratcliff subsequently met with Captain Montgomery who expressed his concurrence with Gomez's assessment of Ratcliff's productivity, and advised Ratcliff to seek another position. A month later, Ratcliff met with Stephens about the problems he was having with Gomez. Stephens counseled. Ratcliff to put his concerns in writing so she could present them to Alvarez.

Following Stephens' request, Ratcliff prepared two documents. The documents purportedly memorialized the discriminatory conduct Plaintiffs claim predominated the Airport District under Gomez's control. Upon completing the documents, Ratcliff gave them to Stephens. During a brief meeting on November 7, 1994, Stephens delivered the documents, without having read them, to Alvarez.[3] It is undisputed that neither Ratcliff, nor any other Plaintiff, followed up with either Alvarez or Stephens.

Plaintiffs claim that Alvarez's failure to respond to the complaints outlined in Ratcliff's documents makes Alvarez liable for the constitutional deprivations they suffered.

the division chief for assistance prior to Diane Paull's tenure.

3. Alvarez does not recall either meeting with Stephens on that date or being given documents. Stephens executed an affidavit, prepared by Plaintiffs in which she confirms that she met with and delivered documents to Alvarez. Stephens recently signed a declaration in which she affirmed, yet expanded, the content of her affidavit. In the latter declaration, Stephens states that she had a fleeting meeting with Alvarez. According to Stephens, the meeting lasted, at most, five minutes, in which Ratcliff's complaints were alluded to, in conjunction with conversation on personal matters. Stephens left the unopened envelope on Alvarez's desk, without knowing if he ever opened, read, or comprehended its contents. Plaintiffs claim that the discrep-

ancies between Stephens' statements, alone, raises a genuine issue of material fact. However, the fact that the only two people who could testify about what transpired during that meeting have only vague recollections of it having occurred, supports the inference that the meeting was not substantive enough to be a monumental factor in deciding the issue of qualified immunity. Furthermore, since the parties to that meeting, Alvarez and Stephens, have proffered the extent of their respective remembrances, Plaintiffs will be unable to introduce credible, admissible evidence detailing the scope and extent of the meeting to any greater degree. Because Plaintiffs will be unable to meet this burden of production, the meeting, for the purposes of the issue before the Court, is immaterial even viewed in a light favorable to Plaintiffs, other than simply stating that it occurred.

They contend that, as Assistant Director, Alvarez was compelled to stop the adverse treatment and discrimination that was occurring at the Airport District. In support of Alvarez's control over their plight, Plaintiffs point out that Alvarez intervened and stopped Ratcliff's transfer out of the Airport District in late 1994. Alvarez recalls that sometime in 1994, he issued a directive halting all transfers out of the Airport District until good reason for the transfers could be confirmed.[4] The directive was instigated by a call Alvarez received from the president of the Police Benevolent Association, who informed Alvarez that several persons were upset over unjustified transfers occurring at the airport. Ratcliff was one of those persons. Alvarez discussed the matter with the division chief and instructed him not to transfer anymore personnel until monthly evaluations documented the deficient performance being used as the bases for the transfers.

In mid-December 1994, Ratcliff went to Major Ford, the District Commander, to seek assistance. Major Ford said he would look into the situation. There is no evidence that anything was done by Major Ford. Ratcliff never followed up.

Finally, on May 10, 1995, then Division Chief Diane Paull met with Buzzi. The meeting was prompted by information relayed to Chief Paull that Buzzi was being harassed by Gomez. During the meeting, Buzzi told Chief Paull of the abuse and harassment that he and other officers were being subjected to by Gomez. Subsequently, Chief Paull met with officers Louie Vergara, Ratcliff, and Frau. Believing there to be a basis for an investigation, she contacted Alvarez.

Upon hearing the allegations, Alvarez directed Chief Paull to contact the Professional Compliance Bureau ("PCB"), the department that investigates improper conduct within the MDPD. According to Chief Paull, it did not appear that Alvarez had been aware of the situation prior to that time. Based on the information Chief Paull related, the PCB initiated an investigation. Following a preliminary investigation into the allegations waged against Gomez, Chief Paull sent a memorandum to Alvarez. The June 2, 1995 memorandum to Alvarez recommended that, in light of the seriousness of the allegations against Gomez and the preliminary findings of the PCB, Gomez be temporarily removed from the GUI. Alvarez removed Gomez from his post on that date.

The PCB commenced a formal investigation into the allegations of discrimination and impropriety purportedly committed by Gomez at the Airport District. Upon its conclusion, the PCB issued a written report, dated December 13, 1995. The report sustained several of the allegations, and found Gomez had acted unprofessionally in carrying out his supervisory responsibilities. The PCB also found that, at times, Gomez failed to follow published procedures for transfers. The PCB did not find evidence that Gomez's conduct rose to the level of national origin discrimination. No allegations of impropriety or unlawful conduct were alleged against Alvarez during the PCB proceedings.

Buzzi and Ratcliff filed Charges of Discrimination with the EEOC. Buzzi filed his charge by affidavit dated May 17, 1995, about the time of his meeting with Chief Paull. Ratcliff filed his EEOC charge by affidavit dated January 2, 1996. Ratcliff's charge asserts that the discrimination began on January 12, 1995 and was continuing up through and beyond the filing of his charge.[5] After receiving their Right to Sue letters, Buzzi and Ratcliff, joined by additional officers, filed this suit in federal court.

On April 3, 1997, Plaintiffs filed their Amended Complaint, alleging, among other things, that Alvarez's failure to affirmatively act to correct the unlawful discriminatory

---

**4.** Although Alvarez does not recall when, in 1994, he issued the directive, one of Ratcliff's documents references the fact that Alvarez stopped the transfers, including Ratcliff's. Therefore, it is presumed that Alvarez's intervention occurred shortly before, but around the same time as, Ratcliff's complaints to Stephens.

**5.** Significantly, Ratcliff testified in deposition that he realized the discrimination upon Gomez's arrival, and was certain of Gomez's unlawful conduct sometime before July of 1994. However, according to his EEOC charge, the date the discrimination allegedly commenced is noted as January 1, 1995; this date is after his purported meeting with Stephens, and the purported delivery of Ratcliff's documents to Alvarez.

practices inflicted by Gomez on the non-Cuban employees at the Airport District constituted intentional discrimination, and violated their rights to equal protection guaranteed by the Constitution. Alvarez has moved for summary judgment on all claims against him, arguing that he is entitled to qualified immunity from suit, as well as from liability. Based on the undisputed facts in the record, the Court agrees that Plaintiffs have not stated viable claims against Alvarez which would preclude summary judgment in his favor based on the doctrine of qualified immunity.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one that might *affect* the outcome of the suit under the governing law. *Id.* A plaintiff cannot defeat a defendant's properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings. *Id.* A mere scintilla of evidence is insufficient to defeat a motion for summary judgment:

> [I]n every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Id.* at 251, 106 S.Ct. 2505. In reviewing a motion for summary judgment the court focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson, supra* ).

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court established a two-prong framework of shifting burdens which must be employed by federal courts in determining whether there exists a genuine issue precluding summary judgment. This framework places the initial burden on the moving party to establish the absence of a genuine issue as to any material fact. *Tyson Foods, Inc.,* 121 F.3d at 646 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). The moving party may discharge this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. In deciding whether the burden has been satisfied, the Court must view the evidence and all reasonable inferences arising from it in the light most favorable to the nonmoving party. *Tyson Foods, Inc.,* 121 F.3d at 646 (citing *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608).

Once the movant has satisfied its burden, the burden shifts to the nonmoving party to present evidence sufficient to make a "showing that the jury could reasonably find for that party." *Allen,* 121 F.3d at 646 (citations omitted). Facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit or other evidentiary material. *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir.1981). However, where the nonmoving party bears the burden of proving an element essential to that party's case, summary judgment is warranted when the party fails to make a showing sufficient to establish the essential element. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Eleventh Circuit commented on the nonmovant's burden:

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrating an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed

verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Tyson Foods, Inc.,* 121 F.3d at 646.

### III. Discussion and Analysis

Plaintiffs' claims of constitutional deprivations derive from Alvarez's failure to take timely action to stop the allegedly rampant, unjustifiable, and discriminatory transfers that were occurring at the Airport District. Plaintiffs contend that this failure to act violated § 1983, by depriving them of equal protection under the laws. Violations of § 1983 occur when a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities *secured by the Constitution and laws.*" 42 U.S.C. § 1983 (1994) (emphasis added).

 A defendant acts under color of state law by "acting with power possessed by virtue of the defendant's employment with the governmental entity." *See Edwards v. Wallace Community College,* 49 F.3d 1517, 1522 (11th Cir.1995). Government employment alone, however, is insufficient. "The dispositive issue is whether the official was acting pursuant to the power [he] possessed by [government] authority or acting only as a private individual." *Id.* at 1523. Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Department of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 685, 98 S.Ct. 2018, 2033, 56 L.Ed.2d 611 (1978).

 The proof of a violation also requires a showing of intent. A defendant may be liable only for an affirmative act or "deliberate indifference" to a risk where the deprivation of a federal right is a "plainly obvious consequence" of the defendant's inaction. *Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1393, 137 L.Ed.2d 626 (1997).

### A. Claims Against Public Officials in Their Individual Capacities Under § 1983

Alvarez, sued in his individual capacity, seeks protection from suit under the doctrine of qualified immunity and has moved for summary judgment on that basis. Alvarez contends that Plaintiffs have not met the burden necessary for denying his entitlement to qualified immunity: (1) that he was not acting within the scope of his discretionary authority; and (2) that he violated a clearly established law or right based on objective standards. *See Evans v.. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997). Even on Plaintiffs' version of the facts, Alvarez is entitled to qualified immunity as a matter of law.

### 1. Qualified Immunity Conferred on Public Officials

Individual defendants may be sued under § 1983 in either their official or individual capacity. When sued in his individual capacity, an official may enjoy qualified immunity from suit in certain situations. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146 (11th Cir.1994).

 The Supreme Court established the test for determining whether a public official can claim qualified immunity. "[G]overnment officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The official's conduct is evaluated under an objective, reasonable standard. *See Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). A government official performing discretionary functions is protected if "a reasonable official could have believed his or her conduct to be lawful in light of *clearly established law and the information possessed by the official* at the time the conduct occurred." *Hardin v. Hayes*, 957 F.2d 845, 848 (11th Cir.1992) (emphasis added). "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150. Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir.1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Entitlement to immunity is the rule, rather than the exception. *See Lassiter*, 28 F.3d at 1149 ("That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities.").

This Circuit applies the Supreme Court's two-part analysis to a defense of qualified immunity. First, the defendant must prove that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred. *See Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir.1995). If the defendant meets this burden, then the plaintiff must show that the defendant violated clearly established law based upon objective standards. *Id.* The plaintiff satisfies this burden by demonstrating that the contours of the plaintiff's rights were so sufficiently clear that a reasonable government officer would have understood that his actions violated plaintiff's rights. *See Swint v. City of Wadley*, 51 F.3d 988, 995 (11th Cir.1995).

It is undisputed that Alvarez, at all times relevant to Plaintiffs' claims, was acting in his discretionary authority. Having established that Alvarez was acting within the scope of his discretionary authority, the burden shifted to Plaintiffs to demonstrate that Alvarez "violated clearly established constitutional law." *Sammons v. Taylor*, 967 F.2d 1533, 1539 (11th Cir.1992). Plaintiffs have not met this burden.

**2. Substantiating Violations of Clearly Established Constitutional Law**

■ To overcome qualified immunity, Plaintiffs must show that: (1) Alvarez violated a federal constitutional right; and (2) that the right was clearly established at the time of the violation. *See Santamorena v. Georgia Military College*, 147 F.3d 1337, 1342 (11th Cir.1998) (citation omitted). For the right to be clearly established, "[t]he contours of the right must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 641, 107 S .Ct. at 3039. In other words, Plaintiffs must show that when Alvarez failed to act, the law was developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in Alvarez's place, that what he was doing violated federal law. *See Braddy v. Department of Labor & Employment Security*, 133 F.3d 797, 801 (11th Cir.1998) (citing *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1459 (11th Cir. 1997)). If it is determined that "the only conclusion a rational jury could reach is that reasonable offic[ials] would disagree about the legality of [Alvarez's] conduct under the circumstances, summary judgment for [Alvarez] is appropriate." *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1378 (11th Cir. 1997) (citation omitted). With these tenets in mind, examining the precise actions of Alvarez and the precise information possessed by him, the Court concludes that a reasonable public official could not have believed his actions were unlawful, in light of clearly established law.

Plaintiffs allege that Alvarez, as Assistant Director of Uniform Operations, was required to be on notice of all operations, including transfers that occurred within the eight districts under his supervision. They further allege that he was notified that sever-

al officers at the Airport District were complaining of discriminatory treatment. Ratcliff prepared two documents for the specific purpose of advising Alvarez of the unlawful activities occurring at the Airport District under Gomez's command. Those documents were delivered to Alvarez sometime in early November of 1994 by Stephens.

Alvarez has testified that he does not recall having received the documents. He admits that he intervened in Ratcliff's transfer, but only after acquiring unsolicited information from the president of the Police Benevolent Association. Ratcliff was merely one of many persons that were effected by Alvarez's intervention at that time.

Furthermore, Ratcliff concedes that he did not follow up with either Stephens or Alvarez after he delivered the documents. Even if the Court were to accept, as true, that Alvarez received and reviewed Ratcliff's documents, lacking information that the allegedly offensive acts continued, an objective recipient could reasonably conclude that the problems at the Airport District had been resolved.

Moreover, evidence shows that once Alvarez was given concrete information that there was a hostile situation at the Airport District, Alvarez immediately authorized an investigation. When that investigation illustrated that some of the complaints might be meritorious, he summarily relieved Gomez of his command at the Airport District.

Perhaps Alvarez could have done more to verify the validity of the complaints outlined in the Ratcliff documents, but the question is whether his response to the situation was constitutionally inadequate. *See Lassiter,* 28 F.3d at 1150. Failure of a public official to act in certain circumstances can amount to a constitutional deprivation, such as when the official shows deliberate indifference to unlawful conduct over which he has control. *See McCoy,* 47 F.3d at 407. However, Plaintiffs bear the burden of proving that Alvarez's actions, in light of his knowledge, are materially similar to the actions and knowledge of public official in Alvarez's position, whose actions were found to be unlawful. *See Lassiter,* 28 F.3d at 1150. Only under those circumstances could Plaintiff arguably show that Alvarez could not have believed his actions were lawful. *Id.* In making this showing, Plaintiffs cannot rely merely on broad legal truisms, requiring officials to "be creative or imaginative in drawing analogies from previously decided cases." *Id.* Although the very action in question need not have previously been held unconstitutional, the unlawfulness must be apparent in light of pre-existing law. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

Plaintiffs have presented nothing to show that every reasonable public official in Alvarez's position would have known that his conduct—failing to act in a situation Ratcliff described only in vague and abstract terms—violated Plaintiffs' constitutional rights. Plaintiffs have not cited to any existing law to support the clearly established nature of this right. Without some precedent holding that an official, similar to Alvarez, has a duty to halt the transfers of personnel, Alvarez had the discretion to decide whether Plaintiffs' complaints required his immediate attention. *See Ensley v. Soper,* 142 F.3d 1402, 1407 (11th Cir.1998).

A thorough examination of the record, required for purposes of summary judgment, reveals additional deficiencies in Plaintiffs' claims against Alvarez. During the investigation conducted by the PCB, several officers, including Plaintiffs, gave sworn testimony about Gomez's alleged discriminatory conduct. None of this testimony even mentions Alvarez, let alone accuses him of unlawful acts or knowing of Gomez's conduct.

Significantly, Ratcliff's own admission belies the fact that Alvarez violated Plaintiffs' clearly established rights. In his Charge of Discrimination submitted to the EEOC, Ratcliff alleged that the discrimination he suffered began as of *January 1, 1995.* However, the documents purportedly detailing the discriminatory treatment, which formed the basis for suing Alvarez, were delivered to Alvarez on *November 7, 1994.* This discrepancy is fatal to Plaintiffs' claims against Alvarez, for Alvarez cannot be liable for depriving Plaintiffs of rights that even they were unaware existed. Thus, Plaintiffs, having failed to demonstrate that Alvarez divested them of clearly established rights, cannot overcome summary judgment on this issue.

### 3. Assessing Qualified Immunity for Supervisor Liability

 Alternatively, Plaintiffs infer that Alvarez, in failing to properly administer his supervisory duties, should be held liable for their alleged constitutional deprivations. It is true that in some situations, supervisors may be held liable for failing to train their subordinates adequately, but the standard by which a supervisor is held liable is extremely rigorous. *See Braddy,* 133 F.3d at 802. For Alvarez to be dispossessed of qualified immunity, it must be shown that his "acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition." *LaMarca v. Turner,* 995 F.2d 1526, 1538 (11th Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). Section 1983 liability is imposed only where the failure to supervise amounts to deliberate indifference to the constitutional rights of persons to whom the supervisor has a duty to protect. *See Gold v. City of Miami,* 151 F.3d 1346 (11th Cir.1998).[6] To establish deliberate indifference, Plaintiffs must present some evidence that Alvarez knew of the need to supervise Gomez in a particular area and made a deliberate or conscious choice not to take any action. *Id.*

 Supervisory liability can occur under § 1983 in two ways: (1) when the supervisor personally participates in the alleged constitutional violation; or (2) when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established through a history of widespread abuse that provides notice to the responsible supervisor of the need to correct the alleged deprivation, and he fails to do so. *See Braddy,* 133 F.3d at 802. "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Id.* (citing *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)).

 The evidence presented by Plaintiffs does not indicate that Alvarez was apprised of an extent of discrimination which would have put him on notice that his failure to halt any unjustified transfers would rise to the level of a constitutional violation. Each MDPD district has a hierarchy of executive officers who are involved in the daily operations of their districts. This tiered structure was designed to address personnel concerns as they arise, and to bring meritorious complaints to Alvarez's attention. Alvarez, responsible for 2,000 employees dispersed among eight districts, could not be aware of the details of events that occurred within the districts on a daily basis. Therefore, he relied on his subordinates to inform him of matters, such as complaints of unlawful conduct. None of the evidence adduced by Plaintiffs supports the assumption that it was improper for Alvarez to rely on his subordinates to bring relevant matters to his attention.

Plaintiffs attempt to use the MDPD Standard Operating Procedures as an authoritative standard of department protocol. They urge that the Operating Procedures required Alvarez to approve district level transfers. Thus, they argue that Alvarez should have known that his failure to follow the internally promulgated protocol could cause Plaintiffs to be deprived of constitutional rights. This simply is not the law.

 The Standard Operating Procedures have no precedential value and are not binding on this Court. Only the U.S. Supreme Court or the Eleventh Circuit Court of Appeals may "clearly establish" rights under federal law for courts in this Circuit. *See Jenkins v. Talladega City Bd. of Educ.,* 115 F.3d 821, 827 n. 4 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997). The Court can find no cases holding that a government official's violation of department policy, without more, constitutes a constitutional violation. *See, e.g., Edwards v. Gilbert,* 867 F.2d 1271, 1276–77 (11th Cir.1989); *see also Davis v. Scherer,* 468 U.S. 183, 193–95, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (public officials "do not

---

**6.** In *Gold,* the police chief, sued in his individual capacity, was granted qualified immunity on the issue of failure to train based on deliberate indifference, because the court found that a reasonable person in the police chief's position would not have known that such a failure infringed on constitutional rights. *See Gold v. City of Miami,* 121 F.3d 1442, 1447 (11th Cir.1997).

lose their qualified immunity merely because their conduct violates some … administrative provision").

There is no evidence that might lead a reasonable juror to conclude that Alvarez violated any clearly established rights of Plaintiffs to intervention. In balancing Gomez's behavior, Alvarez's notice of Gomez's conduct, and Alvarez's response once the matter was brought to his attention, the Court cannot conclude that Alvarez should have known his acts were obviously unlawful. *See Braddy,* 133 F.3d at 802. Because the law was not clearly established that Alvarez's conduct, based on the information he possessed, violated Plaintiffs' equal protection rights, Alvarez is entitled to qualified immunity, and accordingly to summary judgment on Plaintiffs' claim for his failure to intervene.

## B. Establishing Discriminatory Intent

Furthermore, Alvarez argues that Plaintiffs have failed to establish an element necessary to the substantive right which underlies Plaintiffs' claims of national origin discrimination—Alvarez's intent to discriminate. *See Foy v. Holston,* 94 F.3d 1528, 1533 (11th Cir.1996) (citing *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 390–92, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) (the Equal Protection Clause can be violated only by "purposeful discrimination")).

 Violation of equal protection rights requires that the defendant has the intent to discriminate. *Mencer v. Hammonds,* 134 F.3d 1066, 1070 (11th Cir.1998). Qualified immunity also applies to claims involving an illegal motivation, such as discrimination. *See Foy,* 94 F.3d at 1534–35. The resolution of the qualified immunity defense in such a context requires two determinations: (1) that the defendant engaged in conduct establishing discriminatory intent; and (2) that the defendant's actual conduct violated clearly established law. *See Mencer,* 134 F.3d at 1070. Thus, to defeat Alvarez's defense of qualified immunity, Plaintiffs, in addition to showing a clearly established constitutional right was violated, had to present enough evidence to allow a reasonable jury to find that Alvarez intended to discriminate against them. *See Foy,* 94 F.3d at 1533

(when claiming violation of equal rights, discriminatory purpose is something which Plaintiffs must prove to prevail). Plaintiffs have not done so.

The evidence supports no finding of discriminatory intent. Not only have Plaintiffs failed to direct the Court to evidence of discriminatory intent, the issue was never even addressed in their response. There is nothing else in the record, taken in the light most favorable to Plaintiffs, that would allow a reasonable jury to find that Alvarez intended to discriminate against Plaintiffs on the basis of their national origin. Plaintiffs' claims against Alvarez in his individual capacity, therefore, cannot survive summary judgment, because no reasonable person in Alvarez's position could have known that his conduct violated Plaintiffs' clearly established constitutional rights.

## IV. Conclusion

 The issue of qualified immunity is a legal question for the Court, which must decided as early as possible in the case. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Its application is the rule, not the exception. *See Lassiter,* 28 F.3d at 1149. Plaintiffs have failed to convince the Court that their claim against Alvarez represents the exceptional case where qualified immunity should not apply. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant Carlos Alvarez's Motion for Summary Judgment and Incorporated Memorandum of Law [D.E. # 66] is GRANTED.