[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 18, 2008
THOMAS K. KAHN
CLERK

_____

No.  07-11657

_____

D.C. Docket No. 05-02657-CV-BBM-1

GERARD RIOUX,

Plaintiff-
Counter-Defendant-
Appellant,

versus

CITY OF ATLANTA, GEORGIA,
LYNETTE YOUNG,
in her individual capacity,

Defendants-
Counter-Claimants-
Appellees,

DENNIS L. RUBIN,
in his official capacity as
City of Atlanta Fire Chief,

Consolidated Defendant-
Counter-Claimant-
Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 18, 2008)**

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and ALTONAGA,[*]
District Judge.

ALTONAGA, District Judge:

The issues in this appeal, a civil rights action raising claims of race

discrimination, are whether the trial court erred in granting summary judgment in

favor of Appellees, Defendants below, Lynette Young ("COO Young") and

Dennis L. Rubin ("Rubin"), by misapplying the summary judgment standard to the

facts presented and on the basis of Appellees' qualified immunity. While we agree

with Appellant, Plaintiff below, Gerard Rioux ("Rioux"), that he presented a prima

facie case of discrimination and showed sufficient evidence of pretext, we find

that he has not shown Defendants violated clearly established federal law, and we

affirm.

## I. BACKGROUND

_____

[*]Honorable Cecilia M. Altonaga, United States District Judge for the Southern District of
Florida, sitting by designation.

In December 2003, Rubin was hired as Fire Chief of the Atlanta Fire Department ("AFD"). Rubin, a Caucasian male, is the highest-ranking member of the AFD. Rubin's predecessor had appointed Rioux, a Caucasian male, to the position of Deputy Fire Chief of the Field Operations Division of the AFD on a temporary basis in 2002. In January 2004, Rubin made Rioux's promotion to Deputy Fire Chief permanent.

One of Rubin's concerns shared with his supervisory personnel, including Rioux, involved the slow response time of the AFD Fire Investigation Unit ("FIU") in getting to the scenes of fires. On May 2, 2004, although he was off duty, Rioux arrived at the scene of a fire and concluded that members of the FIU, including Lieutenant Michael Austin ("Austin"), had taken too long to arrive. Rioux approached Austin, a Caucasian male, grabbed and pulled him by the lapel of his coat, and proceeded to chastise him for arriving late to the fire. A few days after the incident, Austin filed a formal complaint against Rioux.

The AFD Office of Professional Standards ("OPS") initiated an investigation into the incident. The OPS commander was a member of an organization of African American firefighters known as the Brothers Combined. The OPS is a section within the AFD Office of the Fire Chief and is overseen by AFD Fire Chief and Appellee, Rubin. Shortly after OPS began its investigation,

3

Appellee COO Young, Rubin's direct supervisor and the City of Atlanta Chief Operating Officer, called Rubin and told Rubin "she had received or perhaps even the mayor had received a telephone call from Ivory Lee Young [Councilman of the City of Atlanta] from the Brothers Combined . . . that the . . . investigation of Gerard Rioux . . . was being obstructed by [Rubin]." Although the interference and favoritism allegations against Rubin were found meritless, Rubin also turned the investigation over to the City of Atlanta Law Department ("Law Department").

On July 19, 2004, OPS completed its investigation and concluded that Rioux had violated at least four AFD Work Rules. OPS further concluded that Rioux had been untruthful and uncooperative during the investigation. The Law Department completed its own investigation on September 10, 2004 and reached conclusions similar to those reached by OPS with a few exceptions, most notably that the Law Department disagreed Rioux had lied during the investigation.

Both reports were given to Rubin, as well as COO Young, an African American woman. Rubin recommended to COO Young that Rioux be demoted two ranks to Battalion Chief, the lowest "discretionary officer" position in the AFD. COO Young concurred with Rubin's recommendation. On September 28, 2004, Rioux was informed of Appellees' decision and given a copy of the Law Department's report. Although Rioux believes his actions at the May 2, 2004 fire

4

did not violate any AFD Work Rules, he does not dispute the basic facts of his interaction with Austin that night.

Around the time of Rioux's demotion, Rubin sought to fill the vacated position of Deputy Chief. Assistant Chief Michael Williams ("Williams"), an African American male, testified that sometime in September 2004, Rubin approached him, and after stating Rubin would "more than likely" reduce Rioux in rank, asked Williams if Williams would be interested in accepting the position.[1] Williams rejected the position. According to Williams, Rubin also identified to Williams two others on Rubin's "short list," and these, too, were African Americans. The position was ultimately offered to Nishiama Willis ("Willis"), an Asian woman.

Rioux asserts his demotion from Deputy Chief to Battalion Chief was not the result of his actions at the May 2, 2004 fire but rather Rubin's and COO Young's desire to replace Rioux with an African American. Rioux believes the organization of African American firefighters, Brothers Combined, in conjunction with COO Young, convinced Austin to file the complaint against Rioux and ultimately influenced Appellees' decision to demote Rioux. He also maintains

---

[1] Rubin was evasive in answering questions regarding this issue at his deposition.

5

that Rubin intended and tried to fill his position with an African American, only settling on Willis when no African American candidate would take the job.

Finally, Rioux asserts the disciplinary action taken against him was more severe than that imposed two years later on AFD Battalion Chief, Samuel Dunham ("Dunham"), an African American male, for what Rioux contends is similar misconduct. Dunham was alleged to have grabbed the arm of another AFD member, an African American woman, when she tried to open a refrigerator while leading a tour of high school students through an AFD facility. After grabbing her arm, Dunham verbally berated the complainant in front of the students and other firefighters. After an OPS investigation of the incident, Dunham received a six-day suspension and a written reprimand.

Rioux filed the underlying action in this case against the City of Atlanta and COO Young ("First Complaint") in her individual and official capacities, alleging discrimination in violation of the Equal Protection Clause.[2] The First Complaint alleged a first count under 42 U.S.C. § 1981 against the City and Young, and this

---

[2] The Equal Protection Clause provides, in relevant part, that:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

count was merged into Rioux's section 1983 claim stated in count two.[3] The First Complaint identified Nathaniel Grissom ("Grissom") as a similarly situated high-ranking African American firefighter (former AFD Fire Marshal) who was treated differently from Rioux after coming under investigation. Rioux also alleged that Young "took over [Rioux's] investigation in order to remove Rioux from his position as Deputy Chief in hopes that an African-American would replace him." The City of Atlanta was dismissed from the action with prejudice due to the absence of any allegation that COO Young was the final policymaker for the City.

Rioux separately filed a lawsuit ("Second Complaint") alleging similar claims under sections 1981 and 1983 against Rubin individually and in his official capacity. The second count, under section 1983, alleged a denial of Rioux's equal protection rights based on Rioux's contention that similarly highly-ranked African American members of the AFD, including Samuel Dunham, were treated more favorably than Rioux based on race, despite having committed nearly identical disciplinary infractions to those Rioux committed. The Second Complaint alleged that Rubin's decision to demote Rioux "was motivated by Rioux's race, not only as an act of appeasement to the Brothers Combined and others who continued

---

[3] Section 1983 "constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981." Butts v. County of Volusia, 222 F.3d 891, 893 (11th Cir. 2000) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731-32 (1989)).

7

accusing him of racism toward African Americans, but also as part of Rubin's continuing policy, custom, and practice of achieving and maintaining what he perceives as racial balance among the upper ranks of AFD."

The district court consolidated the actions against COO Young and Rubin and thereafter granted summary judgment in Defendants' favor. Rioux challenges that portion of the trial court's order finding he did not proffer sufficient evidence to support his claim of discriminatory demotion and the trial court's conclusion that COO Young and Rubin were entitled to qualified immunity for claims against them in their personal capacities.[4]

## II. DISCUSSION

Rioux raises three arguments on appeal: (1) the district court erred in applying the summary judgment standard to Rioux's pretext arguments; (2) the district court erred in concluding Dunham was not a suitable comparator to Rioux; and (3) the district court erred in granting summary judgment to Rubin and COO Young in their individual capacities on the basis of qualified immunity. While

---

[4] As noted by Appellees in their brief, Rioux appears to have abandoned his arguments regarding any official capacity claim against Rubin (a claim against the City of Atlanta). See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (official capacity suit is, in actuality, suit against the local government entity the individual represents). Rioux neither challenges the City's dismissal in his briefs, nor did he clarify a contrary view at oral argument. Thus, appeal of any issues concerning the trial court's grant of summary judgment in favor of the City is deemed abandoned. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (issues not argued on appeal are deemed waived).

Appellees disagree in all respects, they also argue the district court improperly determined Rioux had established a prima facie case of discrimination.

A. Standard of Review

The Court's review of the grant of summary judgment is *de novo*, with evidence considered in the light most favorable to Rioux. See, e.g., Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Summary judgment is rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant," United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).

B. Proving Discrimination Through Circumstantial Evidence

As an initial matter, Appellees argue the district court's conclusion that Rioux established a prima facie case of discriminatory demotion was in error. Thus, we turn to this issue first.

A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990); Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1322-23 (11th Cir. 2006) (two theories of intentional discrimination under Title VII are disparate treatment discrimination and pattern or practice discrimination; disparate treatment claims may be proven with direct or circumstantial evidence). Rioux offered only circumstantial evidence in support of his claim of discrimination, and maintained in his summary judgment papers that he brought this consolidated case "solely under the McDonnell Douglas circumstantial evidence analysis." Consequently, we use the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), to evaluate the sufficiency of his claim.[5]

Under the McDonnell Douglas framework, a plaintiff must show an inference of discriminatory intent, and therefore carries an initial burden of establishing a prima facie case of discrimination. Id. at 802. Presenting a prima facie case is not onerous as it requires only that the plaintiff establish facts

[5] Although McDonnell Douglas was a Title VII case, Title VII and section 1983 claims have the same elements where the claims are based on the same set of facts. Abel v. Dubberly, 210 F.3d 1334, 1338 n.3 (11th Cir. 2000). Nevertheless, "[t]he relief granted under Title VII is against the *employer*, not individual employees whose actions would constitute a violation of the Act." Smith v. Lomax, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (emphasis in original) (quoting Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)).

10

adequate to permit an inference of discrimination. <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted).

The successful assertion of a prima facie case then "creates a rebuttable presumption that the employer unlawfully discriminated against" the plaintiff. <u>E.E.O.C. v. Joe's Stone Crabs, Inc.</u>, 296 F.3d 1265, 1272 (11th Cir. 2002) (citing <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 714 (1983)). If this occurs, and a prima facie case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, non-discriminatory reason then shifts to the employer. <u>See</u> <u>Joe's Stone Crabs</u>, 296 F.3d at 1272.

In the last step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." <u>Id.</u> at 1272-73 (quoting <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981)). The focused inquiry in the last step requires the plaintiff to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Combs v.</u>

11

Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citation omitted).

### 1. Prima Facie Case

More than one formulation of the elements of a prima facie case exist. The Court in McDonnell Douglas recognized this when it articulated four elements for a prima facie case[6] but stated that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n.13. Appellees correctly argue that one way of establishing a prima facie case of employment discrimination based on a demotion following an employee's misconduct requires the plaintiff to show that "(1) he belongs to a protected class; (2) he was qualified for the job; and (3) the misconduct for which the employer demoted him was the same or similar misconduct to that which a similarly situated employee engaged in, but was not similarly disciplined for." Moore v. Alabama Dep't of Corr., 137 F. App'x 235, 238 (11th Cir. 2005) (citing Holifield, 115 F.3d at 1562); accord Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 792

---

[6] In McDonnell Douglas, given the facts of that case, the Court stated that a complainant in a Title VII case *may* meet his burden of establishing a prima facie case of racial discrimination by showing (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued seeking applicants from persons of complainant's qualifications. 411 U.S. at 802.

(11th Cir. 1999). Where the racial discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here, then plaintiff must show "that he engaged in misconduct similar to that of a person outside the protected class, and . . . the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." Id. (citing Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1998)).

Under this formulation of the prima facie case, Appellees challenge Rioux's ability to meet the third element, pertaining to a showing of a comparator, that is, a similarly-situated employee who committed the same violation of work rules, but who was disciplined less severely than Rioux. We agree with Appellees' challenge and the trial court's conclusion that Rioux has not presented such a similarly-situated employee, as explained below. Thus, if the third element was required, Rioux could not meet his prima facie showing.

Another formulation of a prima facie case, however, has been articulated in cases raising claims of discrimination where a plaintiff is demoted, and it is this other formulation that the district court applied and that Appellant asserts he satisfied. The district court applied the prima facie test for discriminatory demotion from Sturniolo v. Sheaffer, Eaton, Inc., which differs from the test

articulated by Appellants in that it requires the plaintiff to demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he was demoted; and (4) following the demotion he was replaced by someone outside his protected class. 15 F.3d 1023, 1025 (11th Cir. 1994); see also Hinson v. Clinch County, Georgia Bd. of Educ., 231 F.3d 821, 828 (11th Cir. 2000) (applying same standard in case involving teacher claiming discriminatory demotion). In Sturniolo and Hinson, the demotions were unrelated to any claimed discipline or discipline more severe than that received by others similarly situated. In Sturniolo and Hinson, unlike in the present case, there was no claim that a similarly situated employee had committed a similar violation of work rules, but had been treated more favorably than the plaintiffs.

While Rioux has always maintained in his two complaints that another employee was similarly situated to him but was disciplined less severely than he (Grissom in the First Complaint, and Dunham in the Second), it appears he has raised the comparator issue not as an element of his prima facie showing, but rather, as evidence of pretext, the third step of the McDonnell Douglas burden-shifting framework. See e.g., Silvera v. Orange County School Board, 244 F.3d 1253, 1259 (11th Cir. 2001) (where court examined, as part of the complainant's showing of pretext, whether there was any disparate treatment of a similarly

14

situated employee of a different race); McDonnell Douglas, 411 U.S. at 804 ("Especially relevant" to a showing of pretext "would be evidence that white employees involved in acts against petitioner of comparable seriousness . . . were nevertheless retained or rehired."); Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1563 n.20 (11th Cir. 1987) (noting that comparator evidence may be used to show pretext). We, too, address the sufficiency of any comparator evidence in our examination of pretext, rather than as an element of Rioux's prima facie case, recognizing that it is not always possible for high-ranking employees to find suitable comparators. See Holifield, 115 F.3d 1555, 1563 ("[T]here are only a limited number of potential 'similarly situated employees' when higher level supervisory positions for medical doctors are involved."). Indeed, this Court has previously stated that "*[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*" Id. at 1562 (emphasis in original).

Here, while we agree that Rioux has not presented a comparator, it is undisputed that he has shown he is a member of a protected class; he was qualified for the job; he was demoted; and following the demotion, he was replaced by someone outside his protected class, an Asian American woman. Moreover, in the

15

absence of a similarly-situated employee, and as we further explain below, he has also come forward with "other evidence of discrimination."

In Rioux's view, the district court improperly discounted the following evidence from which an inference of discrimination could be found: (1) Rubin tried to maintain a racial balance at the AFD, maintaining a race tracking spreadsheet of personnel decisions, including Rioux's, that he regularly presented to his political superiors; (2) Rubin had discussions with Atlanta City Councilman, Ivory Lee Young, Jr. ("Councilman Young"), in which Rubin reviewed the spreadsheet and expressed his desire to achieve a particular racial balance of 50/50 black/white among the AFD discretionary ranks; (3) Rubin's "short list" of candidates to replace Rioux contained three black firefighters, and Rubin attempted to recruit a black officer – Williams – to replace Rioux; (4) Rubin felt pressure from the AFD black power structure to harshly discipline Rioux, amidst allegations from the Brothers Combined that Rubin would favor Rioux following earlier and harsh treatment Rubin had given to Grissom, a black chief accused of taking bribes (treatment the Brothers Combined had been critical of); (5) Rioux's aggressive response to the AFD's delayed arrival at the May 2, 2004 fire was prompted by Rubin himself, who had told Rioux the Fire Investigation Unit needed to respond more quickly to fires; (6) an inference could be drawn that

16

Austin was goaded into filing the grievance against Rioux by members of the Brothers Combined; (7) the differences in manner and degree of investigating the Rioux incident as compared to the incident involving proposed comparator Dunham; and (8) evidence showing Dunham *was* a discretionary officer subject to the same rules and supervisor – Rubin – as Rioux, who committed a similar offense to Rioux's but who was treated differently with respect to the investigation of the incident and disciplinary action taken thereafter.

The foregoing categories of evidence, combined with Rioux satisfying the Sturniolo and Hinson prima facie test for discriminatory demotion, lead us to conclude that Rioux satisfied his prima facie showing under McDonnell Douglas.

### 2. Legitimate Reason/Pretext

Because the parties agree Appellees had a legitimate, nondiscriminatory reason for Rioux's demotion following the OPS and Law Department investigations, the presumption of discrimination is eliminated, see Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005), and we accordingly turn to the "focused" inquiry concerning Rioux's showing of pretext. See Silvera, 244 F.3d at 1258. "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." Holifield, 115 F.3d at 1565 (citations omitted). The plaintiff must demonstrate weaknesses or

17

implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons. See Silvera, 244 F.3d at 1258 (quoting Combs, 106 F.3d at 1538). It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for his demotion was pretextual. Chapman v. AI Transp., 229 F.3d 1012, 1024-25 (11th Cir. 2000).

The district court concluded that none of the other evidence submitted by Rioux[7] was sufficient to create a genuine issue of material fact as to whether the proffered reason for his demotion was pretextual. We now address the two general categories of evidence Rioux presented in his effort to show that Appellees' legitimate reason for his demotion was a pretext for discrimination. The first category consists of the first six evidentiary matters identified by Rioux from which a jury could infer discrimination. The second category involves his proposed comparator, Dunham.

(i) Rioux's Claim that Race Motivated the Demotion Decision

---

[7] The trier of fact is permitted to consider the evidence establishing a plaintiff's prima facie case and inferences drawn therefrom on the issue of whether the defendant's proffered reason is pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

18

Citing the Eleventh Circuit's decision in Vessels, 408 F.3d at 771, Rioux argues that his submission of statements by Rubin expressing a desire to conform AFD's personnel to the racial make-up of the City of Atlanta is sufficient evidence of pretext to survive summary judgment. Appellees distinguish Vessels, as the district court did, on the ground that the plaintiff in that case offered at least three additional pieces of evidence in addition to allegedly racially-tinged statements by the defendant, in contrast to Rioux, whom they assert cannot offer any additional evidence. In further support of this position, Appellees cite a series of decisions in which racially-tinged statements alone were held to be insufficient to create a genuine issue of material fact as to pretext. See, e.g., Kincaid v. Bd. of Trustees, 188 F. App'x 810, 816-17 (11th Cir. 2006); Riley v. Birmingham Bd. of Educ., 154 F. App'x 114, 116 (11th Cir. 2005). Appellees also argue that the district court correctly discounted the testimony of Councilman Young, and testimony regarding the role of Brothers Combined in the Rioux investigation, as the record contradicts any assertion that Appellees were influenced by the agenda of either of these parties.

Rioux submitted uncontroverted statements by Rubin stating the latter's belief that the racial composition of the AFD should reflect the racial composition of the City of Atlanta generally. In concluding this evidence was insufficient, the

19

district court interpreted <u>Vessels</u> as standing for the proposition that evidence of racially tinged statements must be coupled with other circumstantial evidence of discrimination to survive summary judgment. The district court distinguished Rubin's statements regarding the racial makeup of the AFD from the statements at issue in <u>Vessels</u>, concluding that Rubin's statements did not express a preference for a particular racial group.[8] The district court concluded that the sum total of the evidence did not call into question Appellees' proffered reason for Rioux's demotion and amounted to mere speculation. While "speculation" may accurately describe some factual assertions by Rioux, other factual assertions find support in the record.

Considering all the evidence, a reasonable factfinder could determine the proffered legitimate reason for Rioux's two-step demotion – an altercation during which Rioux was seeking to impress upon his subordinates Rubin's own directive regarding responding more quickly to fires  – was not the only event that actually motivated Appellees. Rioux's burden, again, was to demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason

---

[8] It is undisputed that Rubin was aware that the City of Atlanta is 60% African American.

stated was insufficient to warrant the adverse action. See Combs, 106 F.3d at1528; Carter v. Three Springs Residential Treatment, 132 F.3d 635, 643 (11th Cir. 1998).

Rioux maintains that between May 10 and September 10, Brothers Combined and Councilman Young brought pressure to bear on Appellees. Cameron Dixon, President of the Brothers Combined, had meetings with COO Young to complain about the Rioux investigation and about Rubin's new process for promoting captains. Dixon complained to COO Young about vindictive attacks by Rubin against black managers. The Councilman, too, contacted COO Young and left a message regarding the matter of Chief Rioux with her. COO Young then asked Rubin to bring her up to date on personnel moves, and to also be prepared to update her on the incident involving Rioux and any actions taken as a result.

When Rubin offered Rioux's position to Williams, Rubin told Williams he had been "instructed to take some actions with Chief Rioux." In his deposition, Rubin only admitted to first offering Rioux's position to Williams after being repeatedly pressed to confirm that fact.

Rioux maintains Rubin adheres to a de facto and unwritten affirmative action policy, and an inference can be drawn that Rioux was demoted as part of

21

the overall strategy of race balancing.[9]  Rubin presents a copy of his spreadsheet two to three times a year to Councilman Young; if Rubin were to show up at a meeting without documentation of the promotions on the basis of race, Councilman Young "would have made a more formal inquiry and would have required that some documentation be provided by the administration."  In response to the question, "How far away from a 50/50 balance between African Americans and Caucasians do you think promotions would have to get before you would take it upon yourself to say something to Chief Rubin. . . ?"  Councilman Young admitted, "If we started getting in the low percentiles of 30 percent or below that."

Taken together and viewed in the light most favorable to Rioux, we cannot say, based upon the foregoing summary of additional evidence, that Rioux has not satisfied his burden of presenting disputed facts showing Appellees were motivated by a discriminatory reason in selecting the level of discipline Rioux received, in contrast to any discipline he could or would have received in the absence of the race-based pressure exerted.

(ii) Dunham as a Comparator

_____

[9] Rioux's demotion was recorded on Rubin's spreadsheet as an appointment of a Caucasian to Section Chief.  Rioux's replacement by Ms. Willis was recorded as the routine appointment of an Asian American.

Rioux's second argument supporting his burden of showing pretext, that Dunham was a similarly-situated employee who was treated more favorably than Rioux following similar misconduct, however, fails. "[T]o determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" Burke-Fowler, 447 F.3d at 1323 (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations and quotation marks omitted)). A comparator is an employee "similarly situated [to the plaintiff] 'in all relevant respects.'" Wilson, 376 F.3d at 1091 (quoting Holifield, 115 F.3d at 1562). The "'quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" Burke-Fowler, 447 F.3d at 1323 (quoting Maniccia, 171 F.3d at 1368) (citation omitted)). Misconduct merely "similar" to the misconduct of the disciplined plaintiff is insufficient. Id. at n.2.

In his pleadings, Rioux advanced two comparators, Grissom and Dunham. At summary judgment and before this Court, Rioux proposes only Dunham as a comparator. Rioux argues that the district court improperly determined Dunham was not an appropriate comparator because it focused on superficial differences between the employees' respective positions within the AFD. Rioux contends the

23

court should have focused instead on the "nature of the offenses committed and the nature of the punishments imposed." Silvera, 244 F.3d at 1259. Appellees assert the district court properly determined that Dunham, a Battalion Chief, was not a suitable comparator to Rioux, a Deputy Chief, because of: (1) the material differences in their respective rank and job responsibilities; (2) the differences in the charges levied against them; and (3) the differing nature of the investigations and the different identities of the individuals making a final decision as to what discipline each employee should receive.

The following facts regarding Rioux's and Dunham's respective ranks and job responsibilities are undisputed. Rioux, who held the second highest position in the AFD, and Dunham, who held the fourth highest, were both among just 40 discretionary officers in a department of approximately 1,200 members. Prior to his demotion, Dunham was a Battalion Chief. There are approximately 30 Battalion Chiefs in the AFD. A Battalion Chief typically oversees a handful of fire stations and less than 50 people.

Prior to his demotion, Rioux was one of only three Deputy Fire Chiefs, second in command to Chief Rubin. As Deputy Chief, Rioux was responsible for five battalions, 35 fire stations, and 45 pieces of equipment. All AFD chief appointments are discretionary; the chiefs serve at Rubin's pleasure. After Chief

Rubin, a Deputy Chief has the highest level of supervision in the AFD. Only Deputy Chiefs fill in for Rubin when he is absent. A Deputy Chief would not consider him or herself to have the same status as a Battalion Chief or an Assistant Chief. Deputy Chiefs have greater responsibilities than Battalion Chiefs, supervise hundreds of more people, and are paid more. Rioux's promotion to Deputy Chief was more meaningful than his other promotions because it was rising to the top of his profession.

As to any differences in the charges levied against Rioux and Dunham, Appellees submit that while Rioux was found to have violated one of the AFD work rules on violence in the workplace, Dunham was not. The Law Department Compliance Unit concluded that Rioux's actions on May 2, 2004 violated four different AFD work rules and two sections of the City Code. In March 2006, Dunham was charged by OPS with violating AFD work rules of conduct, courtesy, and truthfulness.

Finally, Appellees argue that different decisionmakers were responsible for the sanctions imposed on Rioux and Dunham, and each incident was investigated differently. See Silvera, 244 F.3d at 1261 n.5 ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination.") (citing Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir.

1989)).  Appellees assert that, whereas Rubin directly determined Rioux's punishment based on the OPS and Law Department reports, Dunham's discipline (a six-day suspension and letter of reprimand) was determined by a Section Chief of the OPS, Cindy Thompson, and only submitted to Rubin for his approval later.

We are persuaded that Dunham was not a valid comparator on the basis of the first two arguments advanced by Appellees concerning the material differences in the men's respective ranks and job responsibilities and the differences in the charges levied against them.  Admittedly, differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim.  See Lathem, 172 F.3d at 793 (different job titles not dispositive).  Here, however, rank clearly matters, as Rioux was one of only three of the highest-ranked members of the AFD, reporting directly to Rubin.  In contrast, Dunham held a position not one, but two levels distant from Rioux, a position shared by 30 men and women, and consequently, significantly removed from Rubin.  It cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must be similarly accepted from the Chief's immediate advisors, who are held to a higher level of professionalism and who are expected to set the standard of conduct for the department.

Neither Rubin nor COO Young selected the charges Rioux and Dunham were found to have violated, and the charges were not the same. Dunham was neither charged with nor found to have violated an AFD workplace violence rule. As Rioux correctly points out, the most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. Silvera, 244 F.3d at 1259. "[T]he comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Id. (citation and internal quotation marks omitted). The standard for similar conduct is a fairly rigorous one, and here, while the incidents certainly appear to be similar, the offenses Rioux and Dunham were charged with were different. Moore, 137 F. App'x at 239 ("We have previously held that a difference in the charged offenses can preclude a comparison for Title VII purposes.").

Appellees' argument that different decisionmakers were responsible for disciplining Rioux and Dunham (an argument not considered in the district court's order) is unpersuasive. See Anderson v. WBMG-42, 253 F.3d 561, 565-66 (11th Cir. 2001) (different supervisors not dispositive). It is undisputed, for instance, that all discretionary officers in the AFD ultimately serve at the pleasure of the Fire Chief, Rubin, and even as Appellees contend that Rubin was not directly

27

involved in the investigation of Dunham, they concede it was necessary for him to approve the ultimate sanction imposed.

Dunham, whose discipline was meted out two years following Rioux's, cannot serve as a valid comparator to assist Rioux in showing pretext. Nevertheless, as stated, Rioux's other evidence of an unwritten affirmative action plan and pressures exerted by Brothers Combined and Councilman Young, along with Rubin's offer of the position to an African American and evasive answers regarding that offer, are sufficient to satisfy Rioux's burden with respect to pretext.

C. The Qualified Immunity Defense

We now turn to Appellees' defense of qualified immunity, interposed in the individual capacity claims for money damages. "[Q]ualified immunity protects government officials performing discretionary functions[10] from the burdens of civil trials and from liability," McMillian v. Johnson, 88 F.3d 1554, 1562 (11th Cir. 1996) (citing Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)), "[i]n all but exceptional cases." Id. It is only "when an official's conduct violates 'clearly established statutory or constitutional rights of

_____

[10] It is undisputed that Appellees were engaged in discretionary functions at all relevant times.

28

which a reasonable person would have known'" that "the official is not protected by qualified immunity." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

Our qualified immunity inquiry thus proceeds in the following sequence. We must first determine whether the plaintiff has shown that the challenged conduct violates a statutory or constitutional right. See McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Again, we are obliged to review the facts in the light most favorable to the plaintiff. Id.

The law establishing the violation must be pre-existing, that is, it must be in effect at the time of the alleged violation. Id. Moreover, the plaintiff must show that the law establishing the violation was clearly established. Id. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citation omitted). Thus, "[i]f objective observers cannot predict – at the time the official acts – whether the act was lawful or not, and the answer must await full adjudication in a district court

29

years in the future, the official deserves immunity from liability for civil damages." Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996) (citing Elder v. Holloway, 510 U.S. 510, 513-15 (1994)).

Rioux's claims, if believed, would establish a violation of the Equal Protection Clause, which ensures the right to be free from intentional discrimination based on race. Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1268 (11th Cir. 2003); see also Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1064 (11th Cir. 1992) (holding that intentional discrimination in hiring and firing practices violated Equal Protection Clause). If the trier of fact believed Rioux's showing of pretext, and disbelieved Appellees' proffered legitimate reason, then a violation of the Equal Protection Clause would be shown. The "other" evidence from which a jury might infer discriminatory animus on the part of Rubin and COO Young, which we have summarized above, constitutes that showing by Rioux, at the summary judgment stage, of the violation of a constitutional right.

The trial court below addressed the next step in the qualified immunity analysis by noting that there was no real dispute that the right to be free from employment discrimination was clearly established at the time of Rioux's demotion. As a general principle, we can all agree with that statement. See

30

Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1378 (11th Cir. 1997) ("[T]he right to be free from workplace discrimination and harassment on the basis of race . . . [was] clearly established at the relevant times"); Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003) ("[T]here is no doubt that in May 2000, . . . it was clearly established that intentional discrimination in the workplace on account of race violated federal law.") (citation omitted). However, the "clearly established" prong of the qualified immunity analysis asks the question "in light of the specific context of the case, not as a broad general proposition." Williams, 341 F.3d at 1269 (internal quotation marks and citations omitted).

We therefore turn to an examination of "whether the defendant's conduct was nonetheless 'objectively reasonable' in light of that [Equal Protection] right." Johnson, 126 F.3d at 1378 (citing Anderson, 483 U.S. at 638). Rioux must demonstrate at this step in the qualified immunity analysis that a reasonable fire chief and a reasonable chief operating officer of a city would know that demoting a high-ranking, subordinate, discretionary officer in the factual circumstances presented here violated clearly established law. See Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1294 (11th Cir. 2000) (citing Harlow, 457 U.S. 800). And it is this that he cannot show.

Clearly established law provides that state officials "can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully . . . ." Foy, 94 F.3d at 1534 (citing Vil. of Arlington Hts. v. Metro. Housing Dev., 429 U.S. 252, 269-71 n.21 (1977)); see also Mt. Healthy v. Doyle, 429 U.S. 274, 286-87 (1979). Thus, "state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent." Id. (citing Mt. Healthy, 429 U.S. at 286-87). The events of May 2, 2004 are largely undisputed, and the results of the OPS and Law Department investigations confirmed that Rioux violated department rules. Viewing the facts in the light most favorable to Rioux, Appellees had adequate lawful reasons to support their decision to demote Rioux, and may have had improper race-based motives to take the challenged action as well. What Rioux has presented, then, is a "mixed-motives" case, which is governed by the analysis set out in Foy. See Stanley, 219 F.3d at 1295 ("The decision in Foy sets out the proper analysis to apply in potential mixed-motive cases." )

Foy explained:

At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage. Unless

32

it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct – despite his having adequate lawful reasons to support the act  – was the result of his unlawful motive, the defendant is entitled to immunity.  Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful *and* unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.

94 F.3d at 1534-35.

Tracking the reasoning used in Foy to reverse the denial of summary judgment where qualified immunity was interposed as a defense, here no jury could find that it would have been unlawful for a fire chief and the city's chief operating officer to do as Appellees did if they had lacked discriminatory intent. Id. at 1535.  No jury could find that a reasonable fire chief and chief operating officer would never have demoted Rioux but for a discriminatory intent.  Id.  The record here, as in Foy, undisputably establishes that Appellees were motivated *at least in part* by lawful justifications, supported by the independent investigations conducted by OPS and the Law Department, investigations which these two decisionmakers were not a part of and which there is no evidence they manipulated.  Id. at 1535 n.9.  Cf. McMillian, 88 F.3d 1554 (affirming trial court denial of summary judgment where genuine issues of fact existed as to reasons

officials placed plaintiff on death row, in part, due to issue of whether officers lied concerning their reasons).

The Foy analytical framework was applied in Stanley to a mixed motives case, following the Supreme Court pronouncement in Crawford-El v. Britton, 523 U.S. 574 (1998). In Crawford-El, the Court rejected a rule that would have required a heightened burden of proof from plaintiffs in unconstitutional-motive cases. 523 U.S. at 580-86. The Crawford-El decision did not address how courts should apply the objective reasonableness test after a plaintiff creates a jury question on improper motive, where improper motive is an element of the claim, as it is here. Stanley concluded that Foy was the correct approach and remained the law of this circuit. 219 F.3d at 1296 n.26. And so Stanley reiterated that a defendant is entitled to qualified immunity only where "the record undisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations." Id. at 1296 (emphasis in original).

The objective reasonableness inquiry in Stanley proceeded in the following manner. Chadwick, the chief of police, had cause to resent Stanley, a police officer who had years before named Chadwick as a suspect in an investigation. Years after Stanley's remarks, and following several disciplinary incidents, Chadwick terminated Stanley, and Stanley brought a section 1983 action for

34

violation of his first amendment rights. The reversal of the denial of a motion for summary judgment on qualified immunity rested on two undisputed facts. First, the record undisputably established that objectively valid reasons existed for the step Chadwick took, because the incidents underlying the discipline that led to the termination did in fact take place. Thus, "no jury could find that it would have been unlawful to terminate Stanley as Chadwick did absent retaliatory motive." Id. at 1296.

Second, summary judgment was appropriate because the record undisputably established that Chadwick was motivated, at least in part, by the lawful considerations of the disciplinary incidents. A four-year time gap existed between Stanley's initial protected speech naming Chadwick as a suspect, and in those four years, Stanley had engaged in actions that resulted in discipline. "Even if a reasonable police chief acted with retaliatory motive, the law in 1997 did not clearly establish that a reasonable police chief – faced with the same undisputed evidence of Stanley's misconduct and undisputably acting at least in part because of Stanley's misconduct – should not have terminated Stanley in the same manner." Id. at 1297 (citing Johnson, 126 F.3d at 1379).

Similarly, Johnson reversed the denial of a summary judgment motion raising qualified immunity on the ground that the demotion and discharge of the

35

plaintiff-firefighter was based on indisputable and adequate lawful motives, specifically, the firefighter's failure to obey a direct order and repeated lies at his disciplinary hearing. 126 F.3d at 1379. In Johnson, "[e]ven assuming that the defendants acted with some discriminatory or retaliatory motives in demoting and discharging Johnson, the law did not clearly establish that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined Johnson in the same manner." Id. at 1379. Cf. Bogle, 332 F.3d at 1356 (affirming denial of renewed motion for judgment as a matter of law following jury verdict where evidence suggested defendants' evidence of reorganization plan was a sham designed to cover-up race-based transfers and jury squarely found appellants intentionally discriminated on account of race, rejecting proffered nondiscriminatory reasons).

Here, the record shows Appellees were in fact motivated, *at least in part*, by objectively valid reasons in demoting Rioux. Notwithstanding the evidence of pretext, which is sufficient to sustain Rioux's burden of showing that his demotion was the result of discrimination, there is no evidence that Rubin or COO Young influenced two independent investigations concerning the May 2, 2004 incident. There is no evidence that the May 2, 2004 incident did not in fact take place, or that the incident did not involve some violation of one or more work rules by the

36

second-highest ranking member of the AFD. No evidence was presented that Appellees' decisions to demote Rioux were not motivated, at least in part, by the lawful consideration of the OPS and Law Department's concluded investigations and findings. We cannot say that, even assuming Appellees were acting with improper race-based animus or a desire to address race-balancing in the workplace, reasonable officials faced with the same evidence of Rioux's violations of work rules would have known that demoting Rioux violated clearly established federal law.

Because pre-existing law did not provide fair warning to Appellees that demoting Rioux under these circumstances would violate clearly established federal law, Appellees are entitled to qualified immunity.

### III. CONCLUSION

If Rioux had presented his claims under the provisions of Title VII, he would be entitled to have his claims of discrimination heard by a jury. The result we reach here is compelled by the remedy Rioux chose, that is, section 1983 claims against individual decisionmakers rather than his employer, for which the law recognizes the right to qualified immunity. Again, because Rioux has not been able to present any evidence that Appellees' decisions were not motivated, at

least in part, by lawful justifications, Appellees are entitled to qualified immunity.

Accordingly, the judgment of the district court is AFFIRMED.

EDMONDSON, Chief Judge, concurring in the result.

I would not reach the qualified immunity issue because I think the record established no violation of the Constitution. Plaintiff can point to no comparator. The decisions set out in today's court opinion to support a prima facie case are not being followed, but are being extended to the disciplinary-demotion situation. I also doubt that Plaintiff has presented sufficient evidence of pretext. If I believed this record did establish pretext, I would worry that qualified immunity could not apply: no mixed motive, just an unlawful discriminatory one.